**UNITED STATES**

v.

**Steven Leslie SAMPLE and National Farm Purchasing Corp.**

**Crim. No. 82–00115–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 13, 1983.

Patricia A. Kerwin, Asst. U.S. Atty., Richmond, Va., for plaintiff.

Craig S. Cooley, Brown, Bruner & Cooley, Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

On 22 March 1983, the Court entered a judgment dismissing the indictment in this case. This opinion states the reasons for the dismissal.

### I

In a ten count indictment, the defendants were charged with mail fraud in violation of 18 U.S.C. §§ 1341, 3237. The indictment alleged that defendants intended to devise and did devise a scheme and artifice to defraud persons through the sale of memberships in a discount buyers' club. The indictment alleged that defendant National Farm Purchasing Corp. was originally incorporated in Kentucky in April 1975. The indictment also alleged that the corporation was formed to be a discount purchasing club for persons interested primarily in agricultural products.

The indictment alleged that defendant Sample was president of the defendant corporation and was its controlling stockholder and that he was the controlling stockholder in another corporation, National Farm Purchasing Enterprises, Inc., which was incorporated in Indiana in 1978 for the purpose of selling franchises for defendant National Farm Purchasing Corp. and for licensing its franchisees. The indictment alleged that these two corporations became a unity under the control of Sample.

The indictment further alleged that the defendants used the United States mail directly to solicit memberships in the discount buyers' club. Allegedly, interested individuals returned a business reply card to the defendant corporation, and in response to these reply cards defendants' sales representatives visited potential members at their homes and delivered a sales presentation consisting of an "oral pitch," which was

a memorized speech allegedly written by defendant Sample. The indictment alleged that the "oral pitch" was supplemented by the use of a "pitch book," which was a sales manual allegedly written by Sample and containing printed material describing among other things the brand names and types of merchandise that could be obtained at discount prices as well as the amount of the discount and examples of actual discount purchases made by other members. The indictment alleged that various statements in the sales pitch as drafted by Sample on behalf of defendants were false and fraudulent when made.

It was alleged that each individual who purchased a membership in the discount buyers' club was required to pay a $389.00 membership fee and that new members were then sent a membership packet, which included among other things a membership card and price quotation sheets. A total of approximately 5,000 persons from 15 States purchased memberships in the discount buyers' club from the defendants or their franchisees. The indictment alleged that 60 of the persons who purchased memberships resided in Virginia.

Further, it was alleged that the defendants intended to devise and did devise a second prong in their scheme and artifice to defraud persons through the sale of franchise rights to the discount buyers' club. The indictment alleged that defendants sold franchise licenses from the defendant corporation through National Farm Purchasing Enterprises, Inc. The indictment alleged that defendant Sample's sales pitch to prospective franchisees was based upon various statements that were false and fraudulent when made. The indictment further alleged that after a franchise sales contract was signed, franchisees were required by defendants to use and did use without variation the "oral pitch" and "pitch book" supplied by defendant National Farm Purchasing Corp. in order to sell discount buyers' club memberships in the franchisees' licensed territories.

It was further alleged that defendants knowingly made and knowingly caused to be made a number of false and fraudulent statements to prospective discount buyers' club members regarding defendants' relationship with major manufacturers for the direct purchase of goods at discount prices, the size and frequency of the price discounts, defendants' construction of a system of fertilizer manufacturing plants to provide substantial price discounts to members, the limited number of available discount buyers' club memberships, a large storage warehouse of previously purchased goods available at discount prices, the many experienced professional buyers employed by defendants, defendants' size as the largest farm purchasing service in the United States, the representation that defendants dealt in 253,000 items for the farm and home, and what were known as "merchandise checks," which were alleged to be coupons redeemable for an additional $10 savings per $100 of goods purchased, when in fact price quotes to members were increased by $10 to offset the value of the "merchandise checks" and thus make them valueless. The indictment alleged also that defendants intentionally failed to disclose to prospective franchisees that previous franchisees had failed.

It was alleged that the defendants knowingly used the United States mails for the purpose of executing the scheme to defraud. The indictment stated that beginning on or about 25 July 1977 defendants intended to devise and did devise a scheme and artifice to defraud by means of false and fraudulent statements. The offenses alleged in each of the ten counts of the indictment occurred between 15 February 1978 and 15 April 1978.

The ten count indictment, which was ultimately dismissed, was filed on 6 December 1982. On 29 December 1982 defendants were arraigned and pled not guilty. The trial of the matter was set for 28 March 1983. On 10 January 1983 defendants filed a motion to dismiss the indictment. On 22 February 1983 the Court held an evidentia-

ry hearing on defendants' motion.[1] The Court made findings of fact at the conclusion of the evidentiary hearing and took the matter under advisement pending a review of the transcript and a further review of the law.[2] The indictment was dismissed on 22 March 1983.

## II

Defendants assert that their rights under the Fifth Amendment's due process clause have been violated by the government's unjustified pre-indictment delay in this case, which defendants claim resulted in actual prejudice to the defendants' ability to defend themselves against the charges in the indictment.[3]

The time period to be analyzed for pre-indictment delay is the time "between the commission of an offense and the initiation of prosecution," *United States v. Lovasco,* 431 U.S. 783, 784, 97 S.Ct. 2044, 2046, 52 L.Ed.2d 752 (1977). In this case, the indictment alleged that "[b]eginning on or about July 25, 1977 ... the defendants ... devised and intended to devise a scheme and artifice to defraud...." The indictment was returned and filed on 6 December 1982. Thus, the time period subject to analysis for pre-indictment delay is the time between 25 July 1977, and 6 December 1982, a period of five years and five months.[4]

At the 22 February evidentiary hearing on defendants' motion to dismiss, the fol-

1. The evidence adduced at the hearing was substantial. The Court convened at 9:45 a.m. and recessed the hearing at 10:45 p.m. The in-Court time totalled 11 hours.

2. The trial date was continued from 28 March 1983 to 11 April 1983 to permit the parties to file briefs in light of the testimony and evidence adduced at the 22 February 1983 hearing.

3. Originally, defendants' motion included claims under Fed.R.Crim.P. 48(b) and the Sixth Amendment. In *United States v. Marion,* 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971), the Supreme Court held that Rule 48(b), which permits a district court to dismiss an indictment due to pre-indictment or post-indictment delay, was "limited to post-arrest situations."

In *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the Supreme Court noted that the Sixth Amendment does not apply until an indictment or information is filed. *See United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). In this case an information had been filed on 14 December 1981, but it was dismissed on 4 January 1982.

> Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.

*United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982).

Whether the government's dismissal of the charges in this case on 4 January 1982 was in "good faith" within the meaning of MacDonald need not be decided by the Court in light of the Court's disposition on defendants' Fifth Amendment due process claim. However, the Court notes its finding, supported by the explic-

it testimony of Assistant United States Attorneys Baugh and Carpenter, that the 4 January 1982 dismissal of charges was for the express purpose of avoiding Speedy Trial Act time constraints.

4. The dates of the substantive counts in the indictment run from 15 February 1978 to 15 April 1978. At the 22 February 1983 evidentiary hearing, defendants urged that the delay be measured from the date the conspiracy, or scheme, allegedly commenced, 25 July 1977, and the government did not object. The Court finds that this is the appropriate time to begin the period of analysis for pre-indictment delay given the nature of the claim, the nature of the inquiry, and the showing defendants are required to make. *United States v. Lovasco, supra.*

Further, at the evidentiary hearing on 22 February there was testimony from both the defendants' witnesses and the government's witnesses and the Court finds that offenses alleged to have been committed during the summer and fall of 1977 were originally intended to be included in the indictment. However, according to the testimony of former Assistant United States Attorney Baugh and Mr. Benjamin, Sample's original counsel, which the Court accepts, as of early 1982 and with the passage of time it became evident that the statute of limitations of five years might be a problem if the substantive counts were to include offenses committed in 1977. Thus, and presumably for this reason, the substantive counts in the indictment were alleged to have been committed in 1978.

Nevertheless, it is as likely as not that some of the government's witnesses at trial would be witnesses to events that occurred in 1977, and for this reason also it is appropriate to calculate the pre-indictment delay from the earliest date of a criminal violation named in the indictment, 25 July 1977.

lowing chronological sequence of events was established. The first offenses in furtherance of the alleged scheme to defraud were committed in the summer and fall of 1977. The ten substantive counts set forth in the indictment in furtherance of the alleged scheme to defraud were committed between 15 February 1978 and 15 April 1978. Some time during October, 1978, an experienced postal inspector, Alan F. Sharp, was made aware of defendants' activities by reports that a fraud involving the use of the mails was suspected. Inspector Sharp, working under a somewhat heavier caseload than normal, began his investigation of defendants. Inspector Sharp uses a first-in-first-out method of assigning priority to matters referred to him, so this alleged mail fraud had to wait its turn.

By letter dated 27 February 1979, defendants were notified by the United States Attorney for the Eastern District of Virginia that an official criminal investigation was being conducted. On 22 March 1979 a subpoena was served on defendant Sample in the mid-west for certain corporate and business records required to be delivered to a Richmond grand jury on 16 April 1979. In mid-April Sample requested an additional 30 days to comply with the subpoena. On 17 May 1979 Sample by arrangement delivered the subpoenaed documents to postal inspectors in Louisville, Kentucky. These documents were received by the postal inspectors in Richmond on 11 June 1979.

Inspector Sharp reviewed the subpoenaed records and interviewed persons in Virginia who had purchased discount club memberships. This stage of the investigation lasted from June, 1979, through November, 1979.

On 5 December 1979 a second subpoena was served on Sample that by its terms required him to appear before a grand jury in Richmond on 17 December 1979 with additional records. Obedient to that subpoena, Sample traveled from his home in Indiana to Richmond with a number of boxes of documents. Sample presented himself at the grand jury room and was instructed to be seated in the witness waiting room. Sample waited there between four and six hours before someone told Sample he was not to appear before the grand jury, but rather was to deliver the subpoenaed documents to an Assistant United States Attorney. Defendant Sample was escorted to the United States Attorney's office in the adjoining building and met with Assistant United States Attorney David A. Schneider and there delivered the subpoenaed documents.[5]

During the period of time from December, 1979, through April, 1980, Inspector Sharp and the investigators in his office reviewed the additional subpoenaed records, interviewed a substantial number of additional persons about the case, and wrote a case report for presentation to the United States Attorney. Inspector Sharp testified and the Court accepts that a total of 800 to 1,000 manhours had been invested in the case by the Postal Service. Inspector Sharp filed the case report with the United States Attorney in the Eastern District of Virginia by April, 1980.

5. On direct examination Sample testified that this meeting with Assistant United States Attorney Schneider occurred. Assistant United States Attorney Schneider did not recall the meeting, but he would not deny that it occurred. Sample testified that someone else besides Schneider was present but he was not sure that the person was Inspector Sharp. Inspector Sharp did not recall the meeting either. Schneider testified that he would not have met with a potential defendant unless one of his investigators was present.

The government conceded in closing argument at the evidentiary hearing that from Sample's description of the route taken from the grand jury room in the courthouse to the United States Attorneys office in the adjoining building that Sample had indeed made that trip by that route on some occasion. The testimony of Edward M. Steutermann corroborated defendant's testimony that Sample met with Assistant United States Attorney Schneider during this period of time. The Court finds that defendant Sample delivered certain portions of the documents subpoenaed in December, 1979, to Richmond himself and that Sample on that occasion vainly waited for most of the day in the grand jury witness room and then met with Assistant United States Attorney Schneider.

As of April, 1980, the government had fully completed its investigation of defendants. This is firmly established by the testimony of both Inspector Sharp and Assistant United States Attorney Schneider and is corroborated by the testimony of Assistant United States Attorney Baugh. No further "investigative" action was taken in the case until February, 1982, and then only when Assistant United States Attorney Baugh requested that Inspector Sharp revise the victim list to find the "juiciest" victims.

In April, 1980, and at the request of Sample there was a meeting in Richmond in the United States Attorney's office between Assistant United States Attorney Schneider, Inspector Sharp, Sample, Edward M. Steutermann, and Postal Inspector Nunez. There may have been an additional inspector present. Mr. Steutermann was a lawyer and friend of Sample's from Louisville, Kentucky, who was assisting Sample without the payment of any fee. Steutermann was primarily a patent lawyer but he and his firm had previously represented Sample's business enterprises generally.

At this meeting Sample was told that he would be indicted if he did not enter into a plea agreement with the United States. Sample initially responded to this suggestion as he had earlier at the meeting with Assistant United States Attorney Schneider in December, 1979. Sample reiterated that he was not guilty and he refused to enter into a plea agreement.

Sample testified that Assistant United States Attorney Schneider "threatened" to indict defendant's wife and defendant's former sales manager, Jerry Milby, if defendant Sample did not accept a plea agreement. Government's Exhibit 11, dated 15 April 1980, is an outline of the government's proposed strategy for this meeting with Sample; it states that the government planned to indict not only defendant Sample but his wife and Mr. Milby as well; the exhibit further states that the minimum the government would accept in a plea agreement was one count from the corporation and two counts from defendant Sample.[6] The Court finds that Sample understood the government's position to be that his wife would be indicted unless Sample accepted the government's plea agreement and that Sample perceived the government's statement as a threat.

After further discussion with Assistant United States Attorney Schneider and Inspector Sharp, as well as with Mr. Steutermann, Sample changed his position and agreed at the April, 1980, meeting to enter into plea bargaining with the government. A tentative, somewhat loosely constructed, and contingent agreement was reached. Inspector Sharp was notified on 14 May 1980 by the United States Attorney's office that Sample would accept the plea agreement. Other than the "juicy" update requested by Baugh in 1982, Inspector Sharp's only contact with the case thereafter was periodically to call the United States Attorney's office to check on the status of the case.

In approximately July, 1980, Sample contacted the United States Attorney's office in Richmond to talk with Assistant United States Attorney Schneider about the delay in the case, but Schneider was out of town.

In late September, 1980, Assistant United States Attorney Schneider was taken off of the case, and Assistant United States Attorney Norman was assigned. Other than this change in assignments, no effective action was taken by the government from April, 1980, through February, 1981.[7]

---

**6.** Exhibit 11 also included a notation "ASK STEVE [DEFENDANT SAMPLE] IF HE IS TAPERECORDING CONVERSATION. ASK ATTORNEY (OUT OF PRESENCE OF STEVE) WHY THEY ARE HERE." Though he iterated that his memory was not clear, Assistant United States Attorney Schneider testified that defendant Sample was asked to leave the meeting temporarily in order to ask Mr. Steutermann whether Sample was taping the conversation. The government's exhibit appears to contradict Assistant United States Attorney Schneider's testimony in this particular.

**7.** By letter to Steutermann dated 23 September 1980, Assistant United States Attorney Schneider summarized the proposed plea agreement and forwarded a form permitting

By letter dated 17 February 1981 to Sample,[8] Assistant United States Attorney Baugh resurrected the case and the proposed plea agreement. Two subsequent letters from Assistant United States Attorney Baugh to Mr. Steutermann [9] dated 3 March 1981 and 31 March 1981 established two successive deadlines for the resolution of the plea agreement, 16 March 1981, which passed without result, and 15 April 1981.

By letter dated 13 April 1981, Assistant United States Attorney Baugh forwarded to the United States Probation Office in Richmond Sample's signed form approving the preparation of a presentence report. Some seven months later,[10] in November, 1981, the presentence report was completed.[11]

On 14 December 1981 a one count criminal information against defendant Sample and defendant National Farm Purchasing Corp. was filed in the United States District Court for the Eastern District of Virginia. The criminal information and a summons were served on Sample in Indiana on 28 December 1981 at approximately 6 o'clock p.m. The summons required Sample to appear before the United States District Court on 29 December 1981 at 1 o'clock in the afternoon for arraignment on the charge contained in the criminal information.

The next morning on 29 December 1981, at approximately 11:10 a.m., defendant telephoned the Clerk's office in Richmond and arranged to have the arraignment rescheduled to 6 January 1982. At approximately 11:25 a.m. that same morning, Sample called the United States Attorney's office in Richmond and spoke with Assistant United States Attorney Carpenter, in Mr. Baugh's absence, and advised Carpenter of the change in the arraignment date.

On 4 January 1982 defendant Sample left Indiana in order to arrive in Richmond on 5 January 1982 to arrange for the appointment of counsel pursuant to instructions from the Clerk's office in Richmond. In the meantime, without notice to Sample, the United States moved to have the information dismissed, and the information was dismissed on 4 January 1982.

Upon Sample's arrival in Richmond, Virginia, defendant was informed by the Clerk's office that the information had been dismissed. Sample, who was assured he would promptly be reindicted, asked that he be appointed counsel anyway, and Steven D. Benjamin, Esq., was tentatively appointed to represent him.

The decision to dismiss the criminal information was made by Assistant United States Attorney Baugh, who was in Texas at the time, and the decision was relayed by Baugh to Assistant United States Attorney

---

the preparation of a presentence report. The letter specifically stated that in return for the defendants' guilty plea to a one count indictment, "we have agreed not to prosecute Mrs. Sample for her criminal involvement, if any, in this scheme." There was no response to this letter. It appears likely that Steutermann made no timely contact with Sample about it.

**8.** The letter was written to Sample rather than Steutermann because Steutermann had reiterated to the Assistant United States Attorney that he was not Sample's lawyer. He had so stated at the initial meeting in Richmond in April, 1980. But both his conduct thereafter, as well as that of the Assistant United States Attorney, indicated an on-again-off-again legal representation which ill-served all parties—including Steutermann, who was not being paid for what services he rendered.

**9.** *See* n. 8, *supra*.

**10.** The usual time allotted to the preparation of presentence reports in the Richmond Division is two to three weeks.

**11.** Government's Exhibit 8, which is a letter dated 19 June 1981 from Assistant United States Attorney Baugh to Mr. Steutermann, indicates that Sample had been unresponsive to a request from the probation officer for information needed to prepare the report. The Court finds that Sample's lack of response resulted from a breakdown in communication—specifically Mr. Steutermann's failure to remove himself from the process and his failure promptly to notify Sample of the communications from the probation officer and from Assistant United States Attorney Baugh. See defendants' Exhibit I.

In any event, it is uncontradicted that defendant Sample cooperated fully with the probation officer who established contact with him in Indiana, Probation Officer Garrett.

Carpenter. Assistant United States Attorneys Baugh and Carpenter testified and the Court finds that the criminal information was dismissed because the Speedy Trial Act time period had begun to run and because Sample had expressed some undescribed dissatisfaction with the wording of the criminal information.[12] Assistant United States Attorney Carpenter failed to inform defendant Sample during their 29 December 1981 conversation or in any other conversation prior to defendant Sample's departure from Indiana on 4 January 1982 that the criminal information would be dismissed.

It should be noted that the evidence and testimony showed and the Court finds that at all times Sample has emphatically maintained that he was not guilty of any criminal wrongdoing and that he was pleading guilty to a one count information in order to protect his wife.[13]

During the month of February, 1982, Mr. Benjamin, Sample's appointed counsel, communicated several times with Assistant United States Attorney Baugh about the case. As a result of these communications and Sample's insistence on his lack of guilt, it was determined and agreed between Mr. Benjamin and Assistant United States Attorney Baugh that Sample should not and would not plead guilty to any charge.

The Court finds, in accordance with Mr. Benjamin's testimony, that as of February, 1982, Assistant United States Attorney Baugh was aware that in June, 1982, the statute of limitations would run on some of the alleged offenses. Thus, Mr. Benjamin advised Sample in April, 1982, that the best posture for defendant Sample to adopt toward the case was one of a very low profile, and Mr. Benjamin advised Sample to desist in his efforts to prod the government along on the case. Sample continued nevertheless to inquire of Mr. Benjamin about the case and he urged that Benjamin do what was necessary to get the government to move the case along. Sample testified, and the Court accepts, that the pendency of the case had made it extremely difficult for him to earn a living and he felt it imperative that he get it behind him so that he could provide for his wife and children.

In February, 1982, Assistant United States Attorney Baugh contacted Inspector Sharp and asked Inspector Sharp to update the addresses and telephone numbers of the list of victims and to highlight "juicy" victims, that is, those persons alleged to have suffered actual and substantial loss. Inspector Sharp completed that assignment in March, 1982, within one month of the request.

In September, 1982, Assistant United States Attorney Baugh was removed from the case. In early December, 1982, Assistant United States Attorney Kerwin was assigned to the case. On 6 December 1982 the ten count indictment that was the subject of the motion to dismiss was returned and filed.

Between March, 1982, when Inspector Sharp submitted to Assistant United States Attorney Baugh the revised victim list, and the late fall of 1982, the government took no action in the case.

### III

In evaluating defendants' claim that the Fifth Amendment's due process clause requires dismissal of an indictment due to pre-indictment delay by the government, the Court is fully aware that the congressionally enacted five-year statute of limitations, 18 U.S.C. § 3282, is intended to provide defendants with a substantial safe-

---

12. Sample testified that as part of the plea bargain he was to have an "input" into the charge to be set forth in the information as finally drafted.

13. It should also be noted that defendant Sample was under the firm impression, relayed to him by Mr. Steutermann, that defendant Sample's probation officer would recommend that defendant not be sent to jail for the offense charged in the information; further, Mr. Steutermann assured defendant that based on Steutermann's assessment of the case defendant Sample would not receive a jail sentence. This is but another example of Steutermann's lack of astuteness as a criminal lawyer.

guard from governmental delay in the prosecution of these crimes.

However, the Supreme Court has noted that "the statute of limitations does not fully define [a defendant's] rights with respect to the events occurring prior to indictment." *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). The interest of "prevent[ing] prejudice to the defense caused by passage of time . . . is protected primarily by the Due Process Clause and by statutes of limitations." *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982). Thus, the Fifth Amendment's due process clause is an added protection to citizens who are accused of a crime but because of governmental delay are not timely prosecuted.

The analytical distinction between the protections afforded by the statute of limitations and the protections afforded by the Fifth Amendment's due process clause was explained by the Supreme Court in *United States v. Marion:*

> Passage of time . . . may impair memories, cause evidence to be lost, deprive the defendant of witnesses and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient. . . . Possible prejudice is inherent in any delay, however short. . . . The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge. As we said in *United States v. Ewell,* [383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966)], "the applicable statutes of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges."

404 U.S. at 321–22, 92 S.Ct. at 463–64. The Supreme Court rejected defendants' Fifth Amendment due process claim in *Marion* because defendants relied

solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that [defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time [defendants'] due process claims are speculative and premature. 404 U.S. at 325–26, 92 S.Ct. at 465–66.

■ Thus, the statute of limitations erects a legislatively determined safeguard against possible prejudice or the prejudice that may result from the mere passage of time. On the other hand, the Fifth Amendment's due process clause is a safeguard against actual prejudice or the prejudice that did indeed result from the passage of time.

Thus, in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court iterated, consistent with its earlier statements in *United States v. Marion, supra,* that "proof of prejudice is generally[14] a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 97 S.Ct. at 2048. The *Lovasco* Court emphasized that *Marion* "establishe[d] only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid." *Id.* Thus, the initial inquiry is whether defendants have established actual prejudice resulting from the government's lengthy pre-indictment delay in this case.

## IV

■ It is well established that a defendant "must carry a heavy burden to sustain a

---

14. The use of the word "generally" has left open the possibility that a due process violation may be established without the defendant proving actual prejudice. A governmental pre-indictment delay to gain a tactical advantage or to harass a defendant could be so oppressive that Fifth Amendment due process rights would be violated even absent a showing of actual prejudice to the defendant. However, that question need not be decided here due to the Court's disposition on the question of actual prejudice to the defendants.

claim of violation of due process." *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). In "identifying a violation, prejudice to the accused is the threshold criterion." *United States v. West,* 568 F.2d 365, 367 (5th Cir.), *cert. denied,* 436 U.S. 958, 98 S.Ct. 3073, 57 L.Ed.2d 1123 (1978).

The prejudice inquiry asks whether "the delay actually prejudices the conduct of the defense...." *United States v. Stinson,* 594 F.2d 982, 984 (4th Cir.1979). "What the defendant must show is that his defense has been impaired." *United States v. Lieberman,* 608 F.2d 889, 902 (1st Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980). "The proof must be definite, not speculative." *United States v. Mills,* 641 F.2d 785, 788 (9th Cir.), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981).

Defendants advance various claims of actual prejudice: the death of a witness, the loss of witnesses' memories, the loss of documents, the loss of contact with witnesses and potential witnesses, the imprint of bias by the government upon former members of the buyers' club and former franchisees due to the nature of government interviews four to five years ago, and the loss of defendant Sample's financial assets, the bankruptcy of defendant corporation, the loss of subsequent jobs held by Sample. The Court will address defendants' claims in the order mentioned.

### A

The first claim of prejudice is from the death of James S. Seidell, Jr. Mr. Seidell had known defendant Sample since 1973. Mr. Seidell held various positions in defendant corporation first as a salesman and district sales manager, then as national sales manager, and ultimately as general manager of defendant corporation. Mr. Seidell was 50 years old at the time of his death from an airplane crash in March, 1981.

Sample testified, and the Court accepts, that Mr. Seidell was the person most familiar with the corporation other than defendant Sample himself. The testimony and evidence at the evidentiary hearing established that Mr. Seidell was trustworthy and honest, that his demeanor was open and persuasive, and that Mr. Seidell would have been a credible and impressive witness to present to a jury.

Inspector Sharp interviewed Mr. Seidell on 17 March 1980.[15] The Court notes that Inspector Sharp was present as the government's representative throughout the evidentiary hearing on 22 February 1983 and that Inspector Sharp testified after Sample. Since Sample's appraisal of Seidell as a defense witness was unrebutted, the Court accepts his description as accurate.

■ However, defendant must do more than show that Mr. Seidell would have been a credible witness. Defendant is required "to demonstrate the general content of the lost evidence and show that it had a material connection with his defense to the crimes charged." *United States v. Richburg,* 478 F.Supp. 535, 540 (M.D.Tenn.1979). Usually, in cases where the death of a potential witness is alleged to have actually prejudiced the defense, the defendant has difficulty sustaining the burden of establishing the general content and materiality of the dead witness' lost testimony. This is true because in most cases "no one knows what [the witness] would have testified had he lived and been called to the stand...." *United States v. Partyka,* 561 F.2d 118, 123 (8th Cir.1977), *cert. denied,* 434 U.S. 1037, 98 S.Ct. 773, 54 L.Ed.2d 785 (1978). Further, even when a defendant is able, through defendant's own testimony, to describe the general content of what a dead witness would have testified and its materiality, the defendant's incentive to emphasize, perhaps over-emphasize, the importance of the dead witness cannot be overlooked.

However, in this case, Sample's testimony about the general content and materiality of Mr. Seidell's testimony is corroborated. The content of Mr. Seidell's would-be testi-

---

**15.** Inspector Sharp's summary of the interview is government's Exhibit 13.

mony and its materiality is established explicitly and in detail by defendants' Exhibit J: a 114-page deposition of Mr. Seidell taken on 30 April 1979 in a civil case relating to an investigation by the State of Kentucky into defendant Sample, defendant corporation, and their discount buyers' club and franchise operations.[16] Further, the Court finds that Inspector Sharp's testimony corroborated Sample's testimony as to the general content and materiality of Seidell's would-be testimony.

From Mr. Seidell's deposition it is clear and the Court finds that Mr. Seidell was actively involved as general manager including especially that part of the business that sold memberships in the discount buyers' club to individuals. Mr. Seidell helped update and detail the second pitch book. Mr. Seidell testified that he was aware of the consumer protection agency requirements in sales presentations and that he was actively involved in training sales representatives for the company. Mr. Seidell testified that he told his salespersons that two things would definitely get them fired: lying and not making sales calls that they were expected to make.

Mr. Seidell testified that he participated with defendant Sample in preparing a written sales presentation, that he never represented nor did anyone else in the company represent that defendant corporation owned a fertilizer plant in Mississippi. Seidell testified under oath that the defendant corporation intended to do and did for its members what it said it would do. Mr. Seidell testified that he believed the company offered a good service and that it was a service he would have bought for himself had he been a farmer. He testified that he and Sample were very cautious in preparing the sales presentation and in taping the sales presentation for salesman training. When asked whether Mr. Seidell had any reason to believe that Sample would allow his sales representatives to make or whether Sample would make misrepresentations or misleading statements, Mr. Seidell responded under oath, "Absolutely not."

Further, the evidence adduced at the evidentiary hearing established that Mr. Seidell was also involved, at least to some extent, in franchise sales. He had sold at least one franchise. Mr. Seidell also trained franchisees' sales representatives, specifically in Virginia.

Mr. Seidell's deposition thus firmly establishes the general and in some instances the specific content of what his testimony would be were he alive to testify at a criminal trial in Sample's behalf. On the basis of the deposition, there is no doubt that Mr. Seidell's testimony would be heavily favorable to the defendants. The deposition testimony specifically refutes a number of the allegations of false statements contained in the indictment and refutes the allegations in the indictment that these statements were knowingly false and fraudulent. Mr. Seidell pictured the business as an essentially honest enterprise that failed.

Thus, Mr. Seidell's sworn deposition testimony is material to defendants' defense of the indictment. It directly refutes the indictment's allegation that defendants intended to defraud and knowingly defrauded customers, and it provides evidence that defendants' business enterprise was or was intended to be sound, legitimate, and honest. If credited by a jury, Mr. Seidell's testimony would at the least create a reasonable doubt as to defendants' guilt. Indeed, his testimony exonerated defendants.

Clearly, then, defendants have established the general and specific content of what Mr. Seidell's testimony would have been, and defendants have established that Mr. Seidell's testimony was both favorable and material to their defense.[17]

---

**16.** It should be noted that Edward Steutermann represented defendant Sample and defendant corporations in the civil litigation and participated in the Seidell deposition. Mr. Steutermann could barely recall the deposition as having been taken and has no independent recollection of what was said during the deposition.

**17.** At the hearing the government, in apparent acknowledgement of its materiality, offered to stipulate the deposition of Seidell. Twenty-five years as lawyer and judge have convinced me

Finally, it must be demonstrated that the actual prejudice suffered by the defendants was the result of the government's delay. At the evidentiary hearing the Court found that Mr. Seidell "died during the course of wholly unnecessary [governmental] delay." Transcript at 518. The Court finds, in accordance with the testimony of Inspector Sharp and Assistant United States Attorney Schneider and corroborated by Assistant United States Attorney Baugh, that the government concluded its investigation of defendants in April, 1980. The Court also finds, in accordance with the testimony of Assistant United States Attorney Schneider and Inspector Sharp, that, as of April, 1980, the government had what it believed was more than enough evidence to prove defendants' guilt beyond a reasonable doubt. Other than desultory and inconclusive plea negotiations in the spring of 1980, no action was taken by the government until February, 1981, when Assistant United States Attorney Baugh opened up new discussions of the plea agreement. Mr. Seidell was killed in March, 1981, fully eleven months after the government, in its own opinion, had accumulated more than enough evidence to prove defendants' guilt beyond a reasonable doubt.[18] During that eleven-month period, no investigation was undertaken and none was needed.

The Court finds that defendants have concretely proved that the death of Mr. Seidell resulted in actual and substantial prejudice to the defendants' defense and that the actual and substantial prejudice to the defendants from the death of Mr. Seidell is directly attributable to eleven months of unjustified and wholly unnecessary governmental inaction.[19]

B

Defendants' second claim of actual prejudice to their defense is from the loss of memory of potential defense witnesses. Actual prejudice from the loss of witnesses' memories is difficult to establish. "A faded memory claim, while not outside the teachings of common sense, is inherently speculative as to its impact on a given case." *United States v. Juarez*, 561 F.2d 65, 68 (7th Cir.1977). Because proof of loss of witnesses' memories is difficult and its impact on the defense of a case often not readily ascertainable, such a claim is usually categorized as possible prejudice and therefore one appropriately protected by the statute of limitations.

Thus, "the mere possibility that memories may dim is not in itself sufficient to demonstrate prejudice justifying ..." dismissal of the indictment. *United States v. Rogers*, 639 F.2d 438, 441 (8th Cir.1981).

that how a witness testifies is at least equally as impressive as what he says. Depositions tell less than half the story. See Transcript at 134–40.

**18.** In *United States v. Lovasco, supra,* the Supreme Court rejected a constitutional requirement that prosecution begin promptly once the government had in its possession evidence of guilt beyond a reasonable doubt. The Supreme Court indicated that such a rule would impair widespread investigations in which the defendant in hand was merely a spoke in the investigative wheel or, investigations where the identity and protection of government informants would be jeopardized, or investigations where there remained some doubt in the government's mind about the desirability of proceeding with prosecution. Thus, the *Lovasco* Court rejected a constitutional rule requiring prompt prosecution after the accumulation of evidence of guilt beyond a reasonable doubt.

In this case the government has advanced as justification for the delay none of the reasons

discussed by the Court in *Lovasco.* With the exception of the victim list revisions prepared in March, 1982, if defendants' trial were held today the evidence the government would present would be the same evidence the government would have presented against the defendants in April, 1980.

**19.** At the evidentiary hearing the government, through the testimony of Inspector Sharp, attempted to show that since the government's case could be presented without the testimony of Mr. Seidell that the defendants' case also could be presented without the testimony of Mr. Seidell. Quite obviously such an approach misses the mark. The due process inquiry focuses upon the defendants' ability to mount their defense. The discussion in text above indicates clearly that Mr. Seidell was central to the preparation of the defense to the charges in the indictment.

Similarly, "speculation as to what one witness may have forgotten ..." does not satisfy the required showing of actual prejudice. *United States v. Kendrick,* 692 F.2d 1262, 1267 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1892, 75 L.Ed.2d —— (1983). And "general allegations of ... failure of memories are insufficient to establish substantial prejudice." *United States v. Wehling,* 676 F.2d 1053, 1059 (5th Cir.1982). "[T]he claim that the witnesses' memories have dimmed without proof of impairment [does not] constitute actual prejudice." *United States v. Mills,* 641 F.2d 785, 789 (9th Cir.), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981).

Though difficult to prove, "it is possible for a criminal defendant's ability to defend himself to be prejudiced by a genuine lack of memory about the crucial events." *United States v. Richburg,* 478 F.Supp. 535, 542 (M.D.Tenn.1979). Thus, if defendants are able to show who would be their witnesses, that these witnesses' memories have been impaired, what the general content of their testimony would have been had they not lost their memories, that the testimony would have been material to defendants' defense, and that the loss of witnesses' memories resulted from the government's pre-indictment delay, then actual prejudice will have been established.

First, defendants make the general claim that all of their potential witnesses and particularly defendants' customers will have faded or lost recollections of crucial events that occurred five or six years ago. The Court entertains no doubt that defendants are absolutely correct in this assertion.

It is inconceivable that the passage of five or six years would not, at the least, dim witnesses' memories. However, this kind of general claim of possible prejudice from the passage of time is precisely the sort of prejudice that the statute of limitations was designed to safeguard. The memory loss of three of the lawyers involved in the case, as revealed at the evidentiary hearing, is dramatic proof that the limitations period, as a safeguard, may be inadequate.[20]

Second, defendants claim that defendant Sample's loss of memory due to the lengthy pre-indictment delay has caused actual prejudice to his ability to defend himself. This claim is supported by the fact that at the evidentiary hearing Sample repeatedly recalled the April, 1980, meeting in the United States Attorneys' office in Richmond between Assistant United States Attorney Schneider, Inspector Sharp, Inspector Nunez, Mr. Steutermann, and Sample as being held in January, 1980, even though the documentary evidence and the testimony of the other participants at the meeting showed that the meeting was in fact held in April. However, Sample's loss of memory on this point is uninformative about his potential loss of memory about the events charged in the indictment and other events related to the conduct of the business. Sample's loss of memory, if any, about these events remains unproved and therefore speculative.[21]

The Court is obliged to note that in an evidentiary hearing where it is alleged that lengthy pre-indictment delay has caused actual prejudice by the loss of memory, a criminal defendant may find it in his interest at that time to have difficulty recalling

---

**20.** Defendants also argued that proof at the evidentiary hearing of the often complete loss of memory of Assistant United States Attorneys Schneider and Carpenter as well as of Mr. Benjamin is proof that the passage of such a lengthy period of time has had a devastating impact on all witnesses' memories. Again, the Court has no doubt that this is true. However, as the government pointed out at the evidentiary hearing, none of these three named witnesses would be involved in preparing defendants' defense to the charges contained in the indictment. For this reason also, as well as those discussed above in text, defendants' claim of actual prejudice due to loss of witnesses' mem-

ories cannot be established by pointing to the loss of these three witnesses' memories as demonstrated at the evidentiary hearing.

**21.** In this regard, the Court notes that defendant Sample was notified of the criminal investigation in February, 1979, and therefore has had a certain incentive to keep his recollection fresh by documentation and other methods. Further, the Court notes that the civil action brought by the State of Kentucky against defendant Sample provided further incentive for defendant Sample to recall and record the events in question.

various events. Where the claim of loss of memory refers to a criminal defendant's memory and is uncorroborated by testimony from other than the defendant, in this Court's view the claim should be preserved for consideration after a trial on the merits.

Defendants' final claim of loss of a witness' memory relates to Edward M. Steutermann. Mr. Steutermann's law firm represented defendant corporation and defendant Sample in his corporate capacity until January, 1980. Mr. Steutermann was aware of defendants' business activities and represented defendants in the civil action brought by the State of Kentucky. Mr. Steutermann was the defendants' lawyer who deposed Mr. Seidell on 30 April 1979.

Mr. Steutermann is a former Assistant United States Attorney and is now a patent and corporate lawyer. He stated that his experience and his knowledge of defendants' business at the time caused him to believe that the business was sound, legitimate, and honest. Such testimony from a credible witness who was defendants' lawyer throughout the period of time in question would be favorable to the defense.

But at the evidentiary hearing Mr. Steutermann was utterly unable to recall any details to support his reasons for holding those opinions about defendants' business enterprise. Mr. Steutermann was merely able to reiterate that at the time he formulated those opinions he knew sufficient details about the business and its operations to reach those conclusions in his own mind.

At the evidentiary hearing, the government conceded that in light of the evidence of defendants' guilt that the government would present at trial, the testimony of a witness such as Mr. Steutermann would be largely useless without detailed information to support the testimony. Transcript at 475–76.

Mr. Steutermann's testimony would have been material to defendants' defense. His testimony would have refuted the indictment's allegation that defendants' business was financially unsound and that Sample had devised the business operation with the intent to defraud its customers. Defendants' financial soundness is material to the case in its relation to Sample's intent, and Sample's intent is central to the case and is therefore also material.

The Court finds that defendants have concretely established actual and material prejudice to their defense from the loss of Mr. Steutermann's memory, which resulted from the government's lengthy pre-indictment delay from April, 1980, to December, 1982.

## C

■ Defendants' third claim of actual prejudice to the conduct of their defense is that defendants lost a number of documents, which were destroyed by defendants' landlord after defendants were evicted. In order to establish actual prejudice to the defense from the loss of these documents, defendants must describe generally the contents of the documents, demonstrate how the documents were connected to the defense, show that there is no substitute source for the information in the documents, and show that the loss of the documents is directly traceable to the government's delay. *United States v. Richburg,* 478 F.Supp. 535, 540 (M.D.Tenn.1979).

Defendants have failed to meet this burden with respect to the documents alleged to have been lost. Defendant Sample was unable to describe the general content of the documents other than to state that the documents were records kept in the ordinary course of business. Sample stated that the records would show that defendants operated a legitimate business because the business was legitimate, and records of legitimate businesses show that the business is legitimate.

Defendants' showing falls short of establishing actual prejudice to the defense. The content of the records and their connection to the defense are described in terms too general to sustain a finding of actual prejudice. Nor is it established that there is no substitute for the information contained in the records or that the loss of the records was directly traceable to the government's

delay. The Court finds that defendants have not established actual prejudice to their defense from the loss of these documents.[22]

### D

Defendants' fourth claim of actual prejudice caused by the pre-indictment delay is lost contact with large numbers of potential witnesses. Since the events leading up to and surrounding the charges in the indictment occurred nearly five to six years ago, defendants claim that many of their potential witnesses have relocated and changed addresses and telephone numbers. Further, defendants claim that maintaining contact with potential witnesses has been difficult if not impossible due to the geographical dispersion of the witnesses and the financial condition of defendant Sample.

General allegations of lost witnesses do not constitute a showing of actual prejudice. General allegations establish possible prejudice, and possible prejudice from preindictment delay is protected by the statute of limitations.

■ However, defendants did name two potential witnesses alleged to be lost, Jack Stevens and Wallace J. Anderson.[23] But defendants merely set forth the names of two witnesses alleged to be lost. "[I]t is not enough to assert that potential witnesses have been lost. A defendant must identify the witnesses, relate the substance of their testimony and efforts made to locate them." *United States v. Mills,* 641 F.2d 785, 788 (9th Cir.), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981). Defendants have failed to show the substance of either of the potential witnesses' testimony or to describe defendants' efforts to locate the witnesses.[24] Thus, defendants have failed to establish actual prejudice due to any lost witnesses.[25]

### E

Defendants' fifth claim is that the impression left upon defendants' customers by government investigators during interviews conducted four to five years ago created such bias in the minds of defendants' customers as to constitute actual prejudice to defendants' defense. Defendants allege that the government implanted in defendants' customers' minds that defendants were engaged in fraudulent business activities and that this is the main thing his former customers will remember. Defendants claim that this impression has been buttressed by defendant corporation's subsequent bankruptcy and the various losses to customers that resulted from the bankruptcy.

On this ground defendants' claim is too speculative to sustain a finding of actual prejudice. Further, at this point at least, it does not appear that this prejudice could properly be attributed to delay. It was the result, it seems to me, of the manner in which the investigation was conducted. The Court finds that there was no actual delay-induced prejudice to defendants on this ground.[26]

---

**22.** The government argued that their subpoenas left defendants with pitiful little in the way of business records and thus whatever defendants may have been permitted to retain couldn't have been material and probably was not even relevant. The Court credits this argument.

**23.** Mr. Stevens was once located in Virginia; Mr. Anderson was defendant corporation's purchasing manager.

**24.** Sample did explain his inaction in this regard as being due to the lack of financial resources brought about, he says, by the manner in which the government investigated the case and by the impending criminal action.

**25.** Were defendants to prepare for and proceed to trial, defendants may well discover that their efforts to locate these and other witnesses were unsuccessful and that the substance of the witnesses' testimony was material. At that time defendants might be able to establish actual prejudice due to the lost witnesses. Of course, the actual prejudice, if proved, would have to result from the government's delay.

**26.** Were defendants to prepare for and proceed to trial, defendants may well be able to demonstrate actual prejudice on this ground at trial.

## F

Defendants' final claim of actual prejudice to their defense is based on a variety of financial losses suffered by defendants. The bankruptcy of defendant corporation, the loss of Sample's personal assets, and the loss of Sample's subsequent jobs are alleged to have prejudiced defendants' defense and to have been caused by the government's delay. Defendant Sample claims that due to the financial disaster visited upon him by the government and allegedly caused by the government's delay, he has been unable to maintain contact with potential witnesses, or to retain counsel and prepare an appropriate defense.

Serious though they be, the loss of financial assets alone does not establish actual prejudice to the defense. Defendants claim that there has been actual prejudice to the defense due to defendant Sample's financial inability to maintain contact with potential witnesses is too speculative to constitute actual prejudice. No specifics are alleged or shown, and no causal relationship to the government's delay has been established by the evidence. The Court finds that defendants have failed to establish actual prejudice on this ground.

While the price defendants have paid for importuning an inexperienced friend as whilom counsel, because of financial losses, has been great, it is a commonplace that persons investigated for alleged criminal activity suffer financial embarrassment.

## V

The Supreme Court stated in *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid." Thus, after a defendant has established the actual prejudice element of a due process claim, "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. at 2048.

In *Lovasco,* the government established that the reason for the pre-indictment delay was an on-going criminal investigation into the case. The Supreme Court decided that pre-indictment investigative delay was constitutionally permissible.

> We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*Id.* at 796, 97 S.Ct. at 2051–52.

Previously, in *United States v. Marion,* 404 U.S. 307, 324–25, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971), the Supreme Court noted that the Fifth Amendment's due process clause would require dismissal of an indictment if a defendant proved that the government's pre-indictment delay caused substantial prejudice to defendant's right to a fair trial and "that the Government intentionally delayed to gain some tactical advantage over [defendants] or to harass them."

Subsequently, in *United States v. Lovasco, supra,* the Court noted with apparent approval an expanded standard:

> In *Marion* we noted with approval that the government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here ... and expands it somewhat by stating: "a due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense."

431 U.S. at 795, n. 17, 97 S.Ct. at 2051, n. 17.

These three particular standards mentioned by the Supreme Court have been expounded upon by the courts of appeals into general principles to be applied in cases where it is alleged that the government's pre-indictment delay has resulted in a deprivation of Fifth Amendment due process rights.

In *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979), the

court reiterated the standard established by the Supreme Court in *United States v. Lovasco, supra,* and *United States v. Marion, supra,* and stated: "Under *Lovasco* and *Marion,* pre-indictment delay transgresses due process limits only when there is a showing of actual prejudice to the defendant's right to a fair trial *and* unjustifiable Government conduct." (emphasis original).

■ At the evidentiary hearing in this case, the government agreed that this was the appropriate standard: Whether unjustifiable government conduct caused actual prejudice to the defendants' defense. That standard was concisely and correctly summarized by the court in *United States v. Richburg,* 478 F.Supp. 535, 538 (N.D.Tenn. 1979):

> [D]ue process requires dismissal of indictments when the delay in bringing formal charges is unjustified by the legitimate needs of the prosecution and causes the defendant to suffer actual substantial prejudice.

In *United States v. Farber,* 679 F.2d 733 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 163, 74 L.Ed.2d 136 (1982), the court reiterated the applicable standard: "A defendant is entitled to dismissal of an indictment where he shows <u>actual</u> prejudice from an <u>unreasonable</u> delay on the part of the government.... Where actual prejudice is established, the reasons for the delay are balanced against the prejudice shown by the accused." *Id.* at 734–35, *quoting United States v. Taylor,* 603 F.2d 732, 735 (8th Cir.), *cert. denied,* 444 U.S. 982, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979). See *United States v. Reed,* 647 F.2d 849, 852 (8th Cir.1981).

In *United States v. King,* 593 F.2d 269, 271 (7th Cir.1979), the court stated that the "[Supreme] Court in *Marion* intimated that actual prejudice would have to be coupled with some sort of unnecessary delay before a due process violation might arise." The court then stated that the Supreme Court's

decision in *United States v. Lovasco, supra,* "only requir[ed] the defendant to prove actual prejudice, after which showing it is up to the court to balance the reasons asserted by the Government against the prejudice asserted by the defendant." *Id.* at 272.

In *United States v. Townley,* 665 F.2d 579, 582 (5th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982), the court stated that the due process inquiry "turns upon whether the degree of prejudice thereby sustained by the accused is sufficiently balanced by the good faith reasons advanced by the Government." [27]

In *United States v. Glist,* 594 F.2d 1374, 1378 (10th Cir.1979), the court noted that the Supreme Court's decisions in *Lovasco* and *Marion* "require more than ordinary negligence on the part of government representatives." The court affirmed the district court's dismissal of the indictment stating "that while there may have been no deliberate intention on the part of government agents to deceive, there was substantial fault by government representatives, enough to support dismissal for pre-indictment delay under the standards of *Lovasco* and *Marion.*" *Id.*

Finally, in *United States v. Saunders,* 641 F.2d 659, 665 (9th Cir.), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981), the court set forth the following standard: "To determine whether a defendant has been denied due process due to pre-indictment delay, the court must balance the gravity of actual prejudice with the reasons for the delay."

The Fourth Circuit has not had occasion to develop principles that define the circumstances in which the Fifth Amendment's due process clause requires dismissal of an indictment for pre-indictment delay. In *United States v. Stinson,* 594 F.2d 982, 984 (4th Cir.1979), one of two cases in which the court has addressed a fifth amendment

---

27. In *Townley,* the court determined that the actual prejudice to defendant was insubstantial. Thus, in the balance between the insubstantial prejudice and the government's reasons for the delay, the court determined that no due process violation had occurred. However,

the court noted that "[t]he government's reason for the delay, prosecutorial overload and insufficient personnel, might be entitled to slight weight in the balance of due process considerations, if indeed [defendant] had sustained substantial prejudice." 665 F.2d at 586.

claim of pre-indictment delay,[28] the court reiterated that "[d]ue process is not violated simply because the defendant is prosecuted after a substantial investigative delay." Then, the court found that the government's pre-indictment delay "was justified by a need to continue the investigation.…" *Id.*

In *Stinson,* the Fourth Circuit noted: "This [due process] right is violated, however, if the delay actually prejudices the conduct of the defense and the government has 'intentionally delayed to gain some tactical advantage' over the defendant or to harass him." *Id., quoting United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971). Nothing in *Stinson* indicated that this language constituted an exclusive test for determining whether the government's conduct, when it caused actual prejudice to the defendant, violated defendant's due process rights. This Court views the Fourth Circuit's choice of language, i.e., the "right is violated," merely as an established example of what would constitute, in essence, a per se violation of due process, when coupled with defendant's showing of actual substantial prejudice resulting from the delay.

■ Thus, the Second, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits have concluded that under *United States v. Lovasco, supra,* after a criminal defendant has demonstrated actual prejudice to his defense caused by lengthy non-investigative pre-indictment delay, the due process clause requires dismissal of the indictment unless the government can demonstrate that the delay, when balanced against the actual prejudice it caused to the defendant, was not unjustifiable government conduct. In essence, the inquiry asks whether the actual prejudice to the defense caused by the government's delay was justified by the government's reasons for the delay. As with all balancing tests, the inquiry will result in a case-by-case sliding scale: where the actual prejudice to the defendant caused by the government's delay is substantial, the government will bear a heavier burden to justify a lengthy pre-indictment delay. This Court will consider defendants' claim in accordance with the standards developed by the various courts of appeals discussed above.

## VI

■ Applying these legal standards to the facts of this case, it is clear from the evidence adduced at the evidentiary hearing that the government's delay from October, 1978, to April, 1980, while perhaps excessive, was justifiable delay due to an on-going investigation. The evidence that this 18-month delay was for investigative purposes is uncontradicted. As the Supreme Court held in *United States v. Lovasco,* 431 U.S. 783, 796, 97 S.Ct. 2044, 2051–52, 52 L.Ed.2d 752 (1977), "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."

■ It is also uncontradicted that from April, 1980, through February, 1982, the government conducted no further investigation into the case, and therefore the safe harbor of investigative delay established by *Lovasco* is unavailable to the government for this period of time.

The only hint at justification offered by the government for this delay was government personnel adjustments that resulted in the reassignment of Assistant United States Attorneys to the case.[29] Assistant

---

**28.** The other case in which the Fourth Circuit considered a fifth amendment due process claim of pre-indictment delay was *United States v. MacDonald,* 688 F.2d 224, 227 (4th Cir.1982), in which the due process claim was determined by the Fourth Circuit after a remand from the Supreme Court. *See United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). On remand, the Fourth Circuit found Supreme Court dictum "on the nature of and reasons for" the pre-indictment delay to be dispositive of defendant's due process claim. The Fourth Circuit's only discussion of a due process standard focused on fundamental fairness. *Id.*

**29.** The government also intimated that Sample "caused" the delay by equivocating over the terms of his plea bargain. Such an argument is entitled to no consideration in light of the

United States Attorney Schneider testified and the Court accepts that though he was busy he was no busier than usual from April, 1980, through September, 1980, when he was removed from the case. Assistant United States Attorney Norman, who was assigned to the case from September, 1980, through February, 1981, did not testify at the evidentiary hearing as to why nothing was done on the case during those months. Assistant United States Attorney Baugh, who was assigned to the case in February, 1981, testified and the Court accepts that while he was busy he was no busier than usual during the period of time from his assignment to the case through February, 1982. While personnel difficulties encountered by the government may, in some cases, justify a lengthy pre-indictment delay, they are of little moment in cases where the delay has caused actual substantial prejudice to the defense.[30]

The government would have the Court find that Sample simply dallied with the government from April, 1980, to February, 1982, by enticing the government with the prospects of a plea agreement. The Court rejects this argument. None of the Assistant United States Attorneys who handled this case is a fool. Assistant United States Attorneys Schneider, Norman, Baugh, and Carpenter were experienced and hard-driving prosecutors who knew at all times exactly how to resolve the matter: file the indictment. This was simply not done by any of those prosecutors.[31]

The delay from February, 1982, to March, 1982, was the period of time during which Inspector Sharp revised the alleged victim list in order to update addresses and telephone numbers and to highlight sympathetic victims. This was done at the request of Assistant United States Attorney Baugh. The Court finds that this delay does not constitute investigative delay within the meaning of United States v. Lovasco, supra. Inspector Sharp's work during this period of time was necessitated by the government's two year delay dating from the completion of the investigation in April, 1980, and by Assistant United States Attorney Baugh's tactical decision to emphasize certain victims more than others. These reasons advanced by the government do not justify this one-month continued delay, in light of the actual substantial prejudice to the defense already caused by the government's delay.

For the delay from March, 1982, through November, 1982, there is no justification offered by the government. From March, 1982, through September, 1982, Assistant United States Attorney Baugh testified and the Court accepts that he was no busier than usual, though the cases that he was assigned to were more important than usual. Assistant United States Attorney Baugh was removed from the case in September, 1982. There is no justification advanced for the delay from September, 1982, through November, 1982.

It appears that on or about 1 December 1982 Assistant United States Attorney Kerwin was assigned to the case. Shortly thereafter, on 6 December 1982, the indictment was filed. Soon thereafter the matter was brought to a head.

The Court finds, then, that the government's pre-indictment delay from April, 1980 to December, 1982 was not justified.[32]

government's always available power to prosecute. See text infra at 1184.

**30.** See n. 27.

**31.** Indeed, contrary to the government's assertion, substantial evidence was presented that demonstrated Sample's repeated independent efforts to consummate the proposed plea bargain.

**32.** Apparent to the Court from the testimony of the several Assistant United States Attorneys was the government's overweening desire to avoid a difficult and time-consuming trial through the medium of a plea bargain with a penniless defendant fearful of criminal prosecution directed toward his wife. Time, under these circumstances, was on the government's side. Although the Supreme Court and Congress have recognized the desirability of plea bargaining as a legitimate tool on the prosecutor's workbench, in this case prosecution was incidental to the primary objective of a plea bargain rather than a plea bargain being incidental to the primary objective of prosecution.

When balanced against the actual substantial prejudice to defendants caused by the government's delay, the Court finds that defendants' rights to due process have been impaired.

The Court finds further, in accordance with *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971), and *United States v. Lovasco,* 431 U.S. 783, 795, n. 17, 97 S.Ct. 2044, 2051, n. 17, 52 L.Ed.2d 752 (1977), that certain of the government's actions amounted to a tactical delay and delay causing harassment to Sample.[33] Further, the Court finds that the government's conduct throughout the course of the delay from April, 1980, through December, 1982, constituted "prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *United States v. Lovasco,* 431 U.S. 783, 795, n. 17, 97 S.Ct. 2044, 2051, n. 17, 52 L.Ed.2d 752 (1977).

## VII

The final inquiry to determine whether the Fifth Amendment's due process clause requires dismissal of the indictment focuses upon fundamental fairness:

> Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it, we must find that the ab-

sence of that fairness [would] fatally [infect] the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'

*United States v. Valenzuela-Bernal,* —— U.S. ——, ——, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193, 1205–06 (1982). The established facts "fall within the core of the due process protection ... [if] they affect the fairness and reliability of the trial process itself...." *United States v. Richburg,* 478 F.Supp. 535, 540 (M.D.Tenn.1979).

As the Supreme Court noted in *United States v. Lovasco, supra,* the constitutional inquiry under the due process clause is whether compelling defendants to stand trial "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' ... and which define 'the community's sense of fair play and decency'...." 431 U.S. at 790, 97 S.Ct. at 2049.

At the time of their scheduled trial in April, 1983, these defendants were faced with mounting a defense to charges alleged to have commenced in the summer of 1977 —a lapse of almost six years. Combined with the fact that the government was completely prepared to go to trial in April, 1980, and the fact that the evidence the government would present at trial today would be no different from the evidence it would have presented in April, 1980,[34] and in light of the total absence of necessity or other bona fide justification for the government's pre-indictment delay, this Court must answer the following question: Would

---

**33.** The Court makes reference with respect to tactical delay to the dismissal in January, 1982, of the information in order to avoid Speedy Trial Act entanglements and to the delay occasioned by seeking more sympathy-arousing victims.

With respect to harassment, the Court points to bringing Sample from Indiana to Richmond for the supposed purpose of delivering documents to a grand jury and to his consequent day-long sojourn in the witness room. Additionally, no adequate or appropriate effort was made to abort Sample's wholly unnecessary trip from Indiana to Richmond in January, 1982. Further, following the dismissal of that information, the government assured Sample

he would be promptly proceeded against by indictment, yet the government did nothing during the succeeding eleven months.

Noteworthy in this connection is that an Assistant United States Attorney who had had no prior contact with the case was able to secure a true bill within a week of her assignment to the case in December, 1982.

**34.** This finding is for purposes of the constitutional inquiry. It is clear that the government's case would have been stronger in April, 1980, than it would be today. The passage of time from April, 1980, to April, 1983, has certainly prejudiced the government's case also.

compelling defendants to stand trial at this time be fundamentally unfair? The Court firmly believes and finds that given the actual substantial prejudice to the defense caused by the government's pre-indictment delay compared with the unjustified nature of the delay, it would be fundamentally unfair for defendants to stand trial on the charges set forth in the indictment. The Court finds that the due process clause of the fifth amendment requires dismissal of the indictment.

If the facts in the indictment be true several hundreds of people were cheated out of their money through the medium of the United States mails. Hundreds of thousands of dollars were earned by farmers and lost to defendants through a scheme to defraud. Such vile conduct, if the indictment be true, ought to be prosecuted vigorously and promptly. That is the duty of the United States Attorney. Indeed, the prosecution of federal criminal offenses is the prime reason we have United States Attorneys.

The temporizing, fumbling, lost motion, ineffectiveness, and neglect that characterized this case was dismal. The record is but another example of the enervating effect of focusing on plea bargaining rather than on prosecution. With vigorous prosecution, plea bargains will occur. With unnecessary, prejudicial delays in prosecution, dismissals will occur.

For the reasons stated above, the indictment was DISMISSED by order of the Court on 22 March 1983.