UNITED STATES of America

v.

George G. DAVIS, Defendant.

No. 82 Cr. 564–CSH.

United States District Court,
S.D. New York.

June 19, 1984.

On Renewed Motion to Dismiss Indictment
June 19, 1984.

On Motion to Revoke Bail
Nov. 20, 1984.

Rudolph W. Giuliani, U.S. Atty., William M. Tendy, Acting U.S. Atty., S.D.N.Y., New York City, for plaintiff; David W. Denton, Asst. U.S. Atty., New York City, of counsel.

Hollman & Byrne, New York City, for defendant; Daniel P. Hollman, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

On August 17, 1982 a grand jury of this district returned the captioned indictment against Gerald E. Lee and George G. Davis. Lee and Davis were charged in one count of conspiracy to enrich themselves through fraud, and Lee in two counts of violating 18 U.S.C. § 2314. Lee has pleaded guilty. Davis awaits trial on the conspiracy count, scheduled to begin on April 2, 1984. It is expected that Lee, now cooperating with the Government, will testify against him.

The date of the latest overt act alleged in the conspiracy count is November 22, 1977. The statute of limitations on that count accordingly expired on November 22, 1982. 18 U.S.C. § 3282; *United States v. Culoso*, 461 F.Supp. 128, 131 (S.D.N.Y.1978), *aff'd mem.*, 607 F.2d 999 (2d Cir.1979).

The indictment was sealed upon its return, and unsealed on September 15, 1983. On March 21, 1984 Davis moved pursuant to Rule 6(e), F.R.Crim.P., to dismiss the indictment. Alternatively he moves pursuant to Rule 13 to consolidate trial of the captioned indictment with that of Indictment No. 83 Cr. 551, currently pending before Judge Conner.

I treat these motions in order.

*Motion to Dismiss the Indictment*

Davis's motion to dismiss arises from the fact that, while the indictment was timely filed, it was sealed and not made public until after the end of the statutory limitations period.

Sealing an indictment is sanctioned by Rule 6(e)(4), which provides in pertinent part:

"The federal magistrate to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial."

The complications that arise when the statute of limitations runs out while the indictment is sealed were most recently considered by the Second Circuit in *United States v. Muse*, 633 F.2d 1041 (2d Cir.1980) (*en banc*).

The Government contends that, in the circumstances of the case when viewed in the light of *Muse*, there is no merit to Davis's motion. Initially, however, the Government attacks the motion as untimely.

It is true, as the Government stresses, that the Court set a deadline of November 17, 1983 for pre-trial motions. That action was taken pursuant to Rule 12(c). Rule 12(f) provides that a party's failure "to raise defenses or objections or to make requests" by the specified time "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." As noted *infra*, Davis's claim of prejudice resulting from delay in unsealing the indictment relates to the death of two allegedly exculpatory witnesses. Counsel for Davis did not become aware of the death of one of these witnesses, one Jerry Shanks, until early December, 1983. Counsel for defendant has also recently recovered from serious illness. I accept the Government's contention that, notwithstanding these factors, the instant motion could have been made earlier. But I conclude that good cause has been shown for defendant's failure to make this particular argument on or before November 17, 1983, the Rule 6(c) deadline; and that sufficient cause exists to excuse the actual date of filing of the motion to dismiss. Accordingly I proceed to a consideration of its merits.

The "obvious purpose" of Rule 6(e)(4) "is to prevent the requirement of an indictment from serving as a public notice that would enable the defendant to avoid arrest." *Muse, supra,* at 1043. And, as *Muse* makes clear, where there are co-defendants, good faith efforts to arrest one of them will justify the sealing of an indictment as to all. The power to seal an indictment, Judge Newman wrote for the *en banc* court in *Muse,* "is based on the legitimate prosecutorial needs of the Government to capture those properly indicted for criminal activity." *Ibid.*

The case at bar turns upon the Government's efforts to capture Davis's co-defendant, Lee. It is common ground that prior to August 17, 1982, when the grand jury returned the indictment, Lee had departed these shores for Ireland. In these circumstances, Davis argues, the Government cannot be heard to argue that the indictment was sealed in order to facilitate or ensure Lee's arrest. The Government's real reason for sealing the indictment, Davis suggests, was to permit completion of a grand jury investigation into another and more elaborate fraudulent scheme, involving Davis, Lee, and two other defendants. It is this indictment, returned by the grand jury in September, 1983, that is presently pending before Judge Conner. Such tactical considerations, Davis argues, cannot be condoned in derogation of his own right to timely trial under the captioned indictment.

If Davis had accurately identified the reason why the prosecutor sealed the indictment, there would be authority for dismissal. *United States v. Heckler,* 428 F.Supp. 269 (S.D.N.Y.1976); *United States v. Sherwood,* 38 F.R.D. 14 (D.Conn.1964), *aff'd sub. nom. United States v. Doyle,* 348 F.2d 715 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965). But I reject Davis's argument because I cannot accept its basic premise. It is true that Lee had fled to Ireland before the

indictment was filed. However, the Government retained a lively interest in his "capture," to use Judge Newman's word in *Muse*. I am satisfied by AUSA Denton's representations in this case that the Government reasonably believed its prospects of capturing Lee were better if Lee were to travel outside Ireland. In furtherance of that assessment, the Government requested and obtained the assistance of Interpol. The Government also reasonably believed that if Lee learned that he had been indicted by a grand jury here, he would be more likely to keep to ground in Ireland. Therefore the indictment was sealed. The accuracy of the Government's assessment appears to be confirmed by the fact that arrangements were ultimately made for Lee's return to the United States from a country other than Ireland.

■ In these circumstances, I hold that the Government procured the sealing of the indictment in aid of precisely that "legitimate prosecutorial need" contemplated by Rule 6(e)(4) and sanctioned by a line of appellate authority beginning with *United States v. Michael*, 180 F.2d 55, 56–57 (3rd Cir.1949), *cert. denied*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950), of which *Muse, supra,* is the most recent expression in this Circuit.

That holding does not end the inquiry. As *Muse* observes, the Court must balance "adequate recognition of the legitimate interests of both prosecution and the defendant." *Id.* at 1043. The defendant's interest is in avoiding a stale prosecution. His primary protection is the five-year statute of limitations, as enacted in 18 U.S.C. § 3282. *Muse* considered the interaction of that statute and the sealing of an indictment for the indicated legitimate prosecutorial need. In *Muse*, the Second Circuit *en banc* undertook to:

"... provide guidance for determining how much protection should be afforded a defendant when an indictment is returned within the limitations period but maintained under seal until that period has run in order to serve the prosecutori-al interest in arresting an indicted defendant." *Ibid.*

The *Muse* court answered that question as follows:

"We think the defendant's interests are adequately protected by permitting him to secure dismissal only when he can show prejudice occurring during the period when the indictment was sealed, or perhaps only during the post-limitations portion of that period. Only prejudice occurring during either of these periods could be attributable to the prosecutor's decision to seal the indictment; any prejudice occurring prior to the sealing of the indictment is unrelated to this decision, and thus irrelevant to the issue in this case." *Id.* at 1043–44 (footnote omitted).

In a footnote dropped from the text at this juncture, Judge Newman regarded it as "unnecessary in this case to choose between these two time periods or to determine whether different standards of prejudice might be appropriate to each of the two periods." *Id.* at 1044 n. 2.

As noted *supra*, Davis's claim of prejudice arises out of the death of two potential witnesses. One was Jerry Shanks and the other was one Martin Hambrose. As best I can deduce from the motion papers, Shanks died in early December, 1983. I base this upon the following statement in the affidavit of Daniel P. Hollman, Esq., counsel for Davis, submitted in support of the motion:

"On November 30, 1983, your deponent called Seattle, spoke to Mrs. Shanks, who advised her husband was under treatment, and under too much stress to be interviewed. Shortly thereafter, Mr. Shanks passed away."

As to Hambrose, I am told in the Hollman affidavit that he "had died sometime after Thanksgiving of 1982." Paragraphs 27–35 of the Hollman affidavit, which formed the factual basis for the motion, are attached to this opinion as Appendix A.

The conspiracy count in the indictment charges that at the pertinent times, Lee and Davis were officers of the Frigitemp

Corp. Frigitemp was engaged in the business of marine construction. The indictment alleges that the defendants and others engaged in a criminal conspiracy to enrich themselves through the fraudulent submission of fictitious invoices in connection with the acquisition and improvement of a manufacturing plant in Summerville, South Carolina. Frigitemp formulated plans to establish a plant in Summerville to manufacture foam insulation panels for Liquified Natural Gas vessels. Frigitemp officers sought the assistance of Dorchester County, South Carolina in financing the acquisition and improvement of the plant. Ultimately, Dorchester County issued industrial revenue bonds, the proceeds of the bond issue being intended to be used for financing the acquisition and improvement of the Summerville plant. The co-conspirators, the indictment alleges, agreed to submit fictitious invoices to Frigitemp, in order to create the false appearance that funds had been expended for design and engineering work on the plant. In furtherance of that scheme, the conspirators purchased and utilized a "shell" corporation called Interchange Design, Inc. The conspirators submitted fictitious invoices of Interchange Design to Frigitemp. Frigitemp passed the fictitious invoices along to the Trustee of the bond issue, who unsuspectingly paid them. Thus fraudulently obtained funds were funneled through Frigitemp to Interchange Design. Further distributions occurred from Interchange Design to other corporations controlled by the conspirators. Thus an overt act alleged in the indictment is that:

> "On or about June 6, 1977, defendant George G. Davis received an Interchange Design check for $30,000.00, payable to Mamoni Shipping Co., Ltd."

The Government states that its evidence will show that Mamoni Shipping Co. was a company formed by Davis and one Sukhamay Bose for the purpose of implementing the fraud.

Against this background I consider the allegedly exculpatory testimony of Shanks and Hambrose.

A preliminary question arises with respect to Shanks. Under the analysis in *Muse*, Davis is required to demonstrate prejudice "occurring during the period when the indictment was sealed, or perhaps only during the post-limitations portion of that period." In the case at bar, the indictment was unsealed on September 15, 1983. Shanks died in early December of that year. If we look only to the fact of Shanks's death for evidence of prejudice, then the prejudice did not occur "during the period when the indictment was sealed." The death of this witness would then become a fortuitous misfortune, not cognizable on the present motion.

However, focusing upon the date of death to the exclusion of all other factors would pay insufficient attention to Davis's legitimate interests. What controls is the availability of the witness to give testimony, an ability which may be compromised or lost by illness manifesting itself a substantial amount of time before death. Of course, such circumstances trigger the well-recognized obligation on the part of a defendant to take the deposition of a favorable witness if that witness is ill, and defendant is concerned that he may not be available at trial. *United States v. DiFrancesco*, 604 F.2d 769, 777 (2d Cir.1979), *rev'd on other grounds*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

In the case at bar, I am told that after the indictment was unsealed, Davis advised his counsel, Hollman, of the incident involving Shanks which Hollman describes in ¶ 29 of his affidavit. I am not told when Davis first told Hollman about Shanks. When he did so, "Davis advised Shanks had cancer and would have to be reached as quickly as possible." Hollman affidavit at ¶ 30. Davis spoke by telephone to Shanks, at a date not revealed by the record; Hollman thereafter telephoned Shanks at his office in Seattle on October 20, 1983. *Ibid.* Shanks was cooperative, and suggested that Hollman call him during the week of October 24 to set up an appointment. But by October 27, when Hollman attempted to telephone Shanks again, Shanks was in the

hospital where he remained at least through October 31. Hollman's continuing and unsuccessful efforts to interview Shanks before the latter died are set forth in the Hollman affidavit at ¶ 30. One can infer that Shanks felt better at least briefly, since in a November telephone conversation Shanks's wife advised Hollman that "he [Shanks] had a *relapse,* and was not really coherent." (emphasis added). But from October 27, 1983 until his death, the position in respect of Shanks, as described by the Hollman affidavit, is one of basic unavailability by reason of illness.

I may also infer that, as late as October 20, Shanks was healthy enough to be first interviewed and then deposed by the defense. Thus the defense had just over a month from the unsealing of the indictment on September 15 to consider and react to the charges, appreciate the alleged importance of Shanks's testimony, interview him, and arrange for his deposition. I am not prepared to foreclose Davis's reliance upon the Shanks's testimony because a deposition was not accomplished in the month immediately following the unsealing of the indictment. I conclude that Mr. Hollman proceeded with reasonable dispatch in informing himself of the case and attempting to interview Shanks. That is all, in my view, that the law required in the circumstances.

Accordingly I must consider the nature of the Shanks testimony. Two questions arise: is the testimony exculpatory; and is it admissible?

Davis's brief on this motion indicates that the defense regards the testimony of Shanks (and Hambrose) concerning what Lee said at the incidents in question as exculpatory of Davis. But the Government argues that these witnesses' testimony concerning Lee's statements would not be admissible at trial, so that Davis could not be prejudiced by their unavailability. The Government theorizes that the only arguable basis for admitting Lee's hearsay declarations is as a co-conspirator's statements under Rule 801(2)(E), F.R.Evid., and the rule cannot apply because it is limited to

statements "offered against a party ..." The argument is correct; but Davis argues in his brief that Lee could be cross-examined as to his prior statements under Rule 613, and Shanks and Hambrose called as witnesses to undermine Lee's credibility if Lee had denied in his testimony the accounts of the meetings attended by Shanks and Hambrose.

I agree with this general proposition as well; but its practical effect upon the case at bar depends entirely on what Lee's testimony turns out to be. That is because Rule 613(b) permits extrinsic evidence (such as the testimony of Shanks or Hambrose) only in respect of a "prior inconsistent statement" by a witness such as Lee. Davis's brief (p. 7) argues for the applicability of Rule 613 by undertaking to anticipate Lee's testimony:

> "Lee would testify on direct that Davis received $30,000.00 as a payoff in the South Carolina deal. That Bose had no part in it. Lee would deny he told Davis, before Shanks or Hambrose, that Bose was a participant."

Obviously, we cannot tell what Lee's testimony, on direct or cross, will be until he gives it. If that testimony emerges in a fashion other than Davis predicts, the argument under Rule 613 may well be undermined. That would arguably occur, for example, if Lee testified that Davis and Bose were co-venturers in Mamoni Shipping Co., and jointly benefited from illicit payments generated by the "South Carolina deal."

Since a defendant's burden in cases of this nature is to demonstrate "substantial actual prejudice," *Muse,* at 1043, I have concluded that the position can only be properly evaluated at the end of trial, and in the event of a conviction of Davis. At that time we will know just what Lee's testimony was on the pertinent points, as well as the totality of the evidence against Davis.

I reach the same evidentiary conclusions with respect to the suggested testimony of Hambrose. The preliminary questions of

timing do not arise as to him. Hambrose died after Thanksgiving of 1982. The statute of limitations expired on November 22, 1982. Hambrose's death therefore occurred after the statute of limitations ran out, but before the indictment was unsealed. Even by the more strict measurement suggested in *Muse,* Davis may cite Hambrose's death as a potential source of prejudice; and the Government cannot argue that a deposition should have been taken after the indictment was made public, the witness having died before the indictment was unsealed.

In these circumstances, I hold that there is no basis to dismiss the indictment before trial. My conclusion is without prejudice to a renewal after trial in the event of conviction.

In view of the Court's analysis of the evidence that Lee may give on behalf of the Government at trial, it is in my judgment appropriate that the prosecutors be instructed not to discuss that analysis with Lee in preparing his testimony, and I so direct.

*Motion to Consolidate*

■ I deny Davis's motion to consolidate this trial with the criminal indictment pending before Judge Conner. The motion is untimely. There is no reason why it could not have been made as soon as both indictments were made public. The motion now comes, as a practical matter, upon the eve of trial, after the Government has made its trial and witness preparations and this Court has reserved the time. I am also persuaded by AUSA Denton's letter of March 27, 1984 at pp. 4–5, that the case would in any event be inappropriate for consolidation under Rule 13.

*Conclusion*

For the foregoing reasons, defendant's motions are denied. The case will go forward in conformity with this opinion.

It is SO ORDERED.

## APPENDIX A

27. The third, and last, argument in support of the dismissal of the Indictment is the fact Davis suffered actual prejudice in the delay in unsealing of the Indictment. Your deponent has discussed with Davis his defenses to the 1982 Indictment, and the witnesses Davis believes he should call in his own defense. Your deponent now finds that two of these witnesses became sick during the delay period and have died. The delay in the unsealing of this Indictment has precluded Davis from presenting a complete defense.

28. Your deponent became aware of the importance of the first witness, Jerry Shanks, in late 1983 when Davis advised of his knowledge of the facts involved in the Indictment.

29. Davis advised that Jerry Shanks could have been called as a witness in this case, and would have been able to testify to the following facts: Shanks was an employee of Frigitemp from 1974 through mid-year 1978. Shanks worked for, and was personally acquainted with Gerald Lee. Shanks had heard of both Shuk Bose and Mamoni Shipping Company. Shanks and Davis were co-workers, and also personal friends. Shanks would have testified that he was present at Pete's Tavern, located on the corner of 18th Street and Irving Place during mid-1977. Shanks was at the bar with Davis discussing the problems of the Goose Creek L.N.G. Contract. Gerald Lee was also at the bar, was drinking, and appeared slightly intoxicated. Lee came over to Shanks and Davis, and told Davis that, as they had previously discussed, some money was due to Bose. Davis said he remembered that being a problem. Lee in the presence of Shanks and Davis, laid a check on the bar in front of both of them. Lee explained to Davis it was a $30,000.00 Interchange check. Lee pointed out that it was not payable to Bose but to Mamoni Shipping Company, and that Davis would have to get the check deposited into the account. Lee said this should satisfy Bose. Davis picked up the check, placed it in his pocket, and told Lee he would take care of it. Lee returned to his companions at the bar. Shanks told Davis that he knew of

Interchange since he had seen some papers where Interchange was supplying services. Shanks said, based on what he saw take place at Frigitemp before, that he believed Lee was stealing from Frigitemp through use of the Interchange Company. Shanks said that what he had seen, in payoffs and diversions of funds to Ferro Mechanical, they are stealing the place blind. He did not know how long this could go on. Davis advised Shanks that he was resigning. Mr. Davis did submit a resignation and changes were made to keep him employed.

30. Following this disclosure by Davis to your deponent, the latter took steps to reach Mr. Shanks. Davis advised Shanks had cancer and would have to be reached as quickly as possible. As can be supported by the telephone records of this office, your deponent first called Jerry Shanks at the Locheed Shipbuilding Yard in Seattle, Washington, telephone number 1–206–343–6020 on October 20, 1983. Your deponent advised he represented George Davis and believed Mr. Shanks might have some information concerning a 1970 South Carolina stock deal. Mr. Shanks said that Mr. Davis had called him earlier, and that he was expecting a call from the attorney for Davis. In reply to my question, Mr. Shanks said he was familiar with the South Carolina matter, and knew of Shuk Bose. Mr. Shanks advised he was friendly with Davis and that he would talk to your deponent, and to call him during the week of October 24th to set up an appointment. On October 27, 1983, your deponent spoke to Carl Foreman, a co-employee of Shanks at Locheed, who advised Shanks was in the hospital, with a high temperature, and did not know when Shanks would get out of the hospital. On October 31, 1983, your deponent again called Seattle, talked to Foreman, who advised Shanks was still in the hospital and did not know when he would return to work. Thereafter, your deponent called Seattle again, spoke to Foreman, who advised that Shanks home telephone number was 1–206–643–1709. In November 1983 your deponent called Shanks at home, and he advised he had a relapse, and was not really coherent.

Shanks was still undergoing treatment and it was agreed to call again on Monday, November 28, 1983. Four calls were made to the Shanks residence on that date with no response. At the end of November 1983, your deponent went to Los Angeles, California on other business, and in the hope that while on the West Coast arrangement could be made to interview Mr. Shanks. On November 30, 1983, your deponent called Seattle, spoke to Mrs. Shanks, who advised her husband was under treatment, and under too much stress to be interviewed. Shortly thereafter, Mr. Shanks passed away.

31. The Government may argue that since Mr. Shanks died a couple of months after the 1982 Indictment was unsealed, that the sealing did not deprive Davis of the testimony of a supportive witness. However, as the facts indicated, Mr. Shanks was not able to testify at all since he was under treatment. Had the Indictment been opened in August 1982, no doubt Mr. Shanks would have been able to testify in early 1983 since he remained on his job through early October 1983.

32. Following this situation, your deponent again discussed with Davis whether he could recall any other situations that might be used in his defense. Davis recalled a lunch he had with Martin Hambrose and co-defendant Lee.

33. Davis stated that Martin Hambrose would be able to testify that Hambrose had knowledge of certain facts that would have been helpful to Mr. Davis in the defense of the charges contained in the 1982 Indictment. Mr. Davis related those facts which he believes would have assisted in his defense.

Sometime during 1977, Mr. Davis received a telephone call at his office from a man who introduced himself as Martin Hambrose. Mr. Hambrose related that he was in the salvage business and wanted an appointment to meet with Mr. Davis relative to the possibility of purchasing salvage material from Frigitemp. He stated that

Corporate Personnel suggested he contact George Davis.

Sometime later, Mr. Hambrose visited with Mr. Davis, introduced himself and stated that he owned a salvage business (Mr. Davis does not remember the name of the Company). Mr. Davis advised that he did not believe Frigitemp had any volume of material that Mr. Hambrose would be interested in but he nonetheless, had someone from the office meet with Mr. Hambrose to discuss the possibilities. Sometime later, Mr. Hambrose returned to the office and had a brief discussion with Mr. Davis as to the potential purchasing of rejected foam panels. Mr. Hambrose indicated that he thought it possible that the scrap metal could be re-liquified as per a project Frigitemp was considering and reused as a chemical. Mr. Hambrose inquired as to an estimate of the volume of foam panels that might be available. Mr. Davis advised that Frigitemp was rejecting a considerable quantity of foam panels because they did not meet their specifications. However, Mr. Davis also advised Mr. Hambrose that Frigitemp was receiving full credit from CPR Upjohn for all panels rejected by Frigitemp. As a result of this, Frigitemp was not in a position to offer the panels for sale since they were the property of Upjohn. Mr. Hambrose then asked Mr. Davis if he would inquire of Upjohn as to the possibility of purchasing the rejected panels. Mr. Davis indicated that was possible, but that there would be no point in making such an inquiry of Upjohn, unless there was a market available for the sale of the panels. Mr. Davis expressed a reservation as to the availability of the buyers who would have the capability of using same. Mr. Hambrose stated that he would make some inquiries to determine this potential market.

During the following week, Mr. Hambrose called Mr. Davis and met with Mr. Davis on one occasion for lunch. At this lunch meeting, Mr. Hambrose told Mr. Davis that he had a potential buyer for the foam panels. Mr. Davis then agreed that he would pursue the matter further and asked Mr. Hambrose to come to his office the following Monday. That afternoon Davis advised G. Lee and asked how he wished to handle this matter. Lee said let me speak with Hambrose on Monday.

The following Monday, Mr. Hambrose came to the office. Mr. Davis placed a call to Jerry Lee on the speaker phone and advised Mr. Lee that Mr. Hambrose was in his office and was interested in purchasing the rejected foam panels. Mr. Davis then advised Mr. Lee that Frigitemp could not sell the panels directly to Mr. Hambrose, since they were the property of Upjohn by virtue of Upjohn giving Frigitemp a full credit for all defective paneling. However, Davis told Lee that they would need an outlet when Frigitemp started manufacturing. Jerry Lee then told Davis that rather than try to discuss this over the phone, that Davis and Hambrose meet him for lunch. Hambrose and Davis then left the office and went to an Italian restaurant on Irving Place (Davis believes the name of the restaurant was Jimmy's) where they met with Lee. Hambrose told Lee that he had a potential buyer for the defective paneling. Davis then explained to Lee that Frigitemp would either need to keep the panels at a discount price or get a commission from CPR Upjohn, otherwise, Frigitemp could not sell the paneling to Hambrose. Davis advised Lee this did not prevent him from making a deal on the panels Frigitemp would produce. Lee then suggested that a deal might be made with Upjohn to sell their reject panels until Frigitemp started manufacturing, but Frigitemp would have to receive either a finder's fee or a commission on any panels purchased. Lee told Hambrose that Frigitemp would seek to resolve the panel sales with a commission from Upjohn, but if that did not prove feasible, he expected Hambrose to pay the commission. Hambrose indicated that either one of those alternatives would be acceptable at the right price.

At that point, a restaurant employee came to the table and told Lee that there was a telephone call for him. Lee left the table to take the call and Davis continued his conversation with Hambrose. Lee returned to the table a few minutes later and

appeared to be in a very agitated state. Davis asked him what the problem was and Lee replied that he was getting tired of "that little son of a bitch" trying to screw him. Davis asked who he was talking about and Lee said Bose. Lee asked Davis if he remembers having obtained a $30,-000.00 check payable to Mamoni, which Lee had given Davis to pass to Bose. Davis told him that he remembered the check and stated Bose now had the money. Davis then asked Lee what is the problem now. Lee said that Bose wanted additional money as a commission for some Bearer Bonds that had been purchased. Lee said you know that problem with Bose, well he had now called the broker and may get Mel, Joey and myself in jail, if he doesn't stop stirring shit. Lee said Bose stated that he wanted additional money as a commission. Lee then asked Davis to call Bose and see if this could be settled once and for all time. Davis said he would call Bose. Lee then apologized to Hambrose for the interruption of the meeting, but told him that he would have others check with Upjohn about the possibility for arranging a purchase of the rejected foam panels. Lee then left the restaurant. A short time later, Davis and Hambrose left the restaurant.

From time to time during the next couple of weeks, Hambrose called Davis to ask him what was going on with the Upjohn deal. Davis told Hambrose that he had not heard anything further from Lee but that Hambrose should feel free to call Lee and make a direct inquiry. Davis then gave Hambrose Lee's telephone number and thereafter, did not hear from him again. Davis does not think Lee and Hambrose ever put a deal together.

34. Subsequently, Davis advised Hambrose had died some time after Thanksgiving of 1982. Again, the unsealing of the Indictment would have permitted the defense to obtain his deposition, or, at least, apply to the Court for relief.

35. Thus, the actions of the Government in sealing the Indictment was prejudicial to Davis and served to deny to him the ability to prepare his defenses to this criminal action.

## ON RENEWED MOTION TO DISMISS INDICTMENT

Defendant George G. Davis was convicted after a jury trial of one count of conspiracy in violation of 18 U.S.C. § 371. Prior to trial, defendant moved to dismiss the indictment pursuant to Rule 6(e), Fed.R. Crim.P., on the ground that he had been unduly prejudiced by the Government's improper sealing, and unreasonable delay in unsealing, the indictment. The claimed prejudice arose from the death of two allegedly exculpatory witnesses, one Jerry Shanks and one Martin Hambrose.

In this Court's opinion of April 2, 1984, familiarity with which is assumed, I concluded that the Government's sealing of the indictment and the timing of the subsequent unsealing were entirely proper. With respect to the question of prejudice, defendant Davis contended that the testimony of the now-deceased Hambrose and Shanks would have been instrumental in undermining the credibility of his co-defendant Gerald Lee, now a cooperating witness. Specifically, their accounts of two brief conversations engaged in by Lee and Davis were expected to reveal inconsistencies between Lee's testimony at trial and prior statements he allegedly made. In short, defendant argued that pursuant to Rule 613, Fed.R.Evid., Lee could be cross-examined as to statements made in the presence Shanks and Hambrose and they could be called to discredit his testimony.

The force of defendant's admissibility argument depended, of course, on the accuracy of his speculations regarding Lee's testimony. The anticipated testimony was described as follows:

"Lee would testify on direct that Davis received $30,000.00 as a payoff in the South Carolina deal. That Bose had no part in it. Lee would deny he told Davis, before Shanks or Hambrose, that Bose was a participant." (Def.Br. at 7).

The testimony of Shanks and Hambrose, on the other hand, would purportedly sup-

port defendant Davis's position that "he was not paid off and that any deal was between Lee and Bose." (*Id.*). As stated in this Court's prior decision:

"Obviously, we cannot tell what Lee's testimony, on direct or cross, will be until he gives it. If that testimony emerges in a fashion other than Davis predicts, the argument under Rule 613 may well be undermined. That would arguably occur, for example, if Lee testified that Davis and Bose were co-venturers in Mamoni Shipping Co., and jointly benefited from illicit payments generated by the 'South Carolina deal.'

"Since a defendant's burden in cases of this nature is to demonstrate 'substantial actual prejudice,' *Muse*, at 1043, I have concluded that the position can only be properly evaluated at the end of trial, and in the event of a conviction of Davis. At that time we will know just what Lee's testimony was on the pertinent points, as well as the totality of the evidence against Davis." (at 458).

Accordingly, defendant's motion to dismiss was denied without prejudice to renewal after trial, at which time the Court would be in a better position to assess the actual prejudice to defendant's case. Defendant now renews his motion to dismiss the indictment and, in the event that application is denied, seeks a hearing to determine what efforts were made by the Government to apprehend Gerald Lee following the sealing of the indictment. With respect to the latter application, I have already carefully considered the circumstances giving rise to the sealing of the indictment and adhere to my earlier ruling that the Government acted properly and in aid of a legitimate prosecutorial need. *See United States v. Muse*, 633 F.2d 1041 (2d Cir.1980) (*en banc*), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981). The unsupported assertion that the Government's efforts to apprehend Lee were undertaken in connection with the 1983 indictment, but not in connection with the instant indictment, is entirely unpersuasive. Indeed, having determined that the Government acted reasonably and in good faith in

procuring a sealed indictment, leave to renew the motion to dismiss was limited to the narrow question of whether actual prejudice to defendant occurred during the period when the indictment was sealed. *See Muse, supra; United States v. Slochowsky*, 575 F.Supp. 1562, 1567 (E.D.N.Y.1983) ("If there is a legitimate prosecutorial need for the sealing, the defendants, to be entitled to dismissal, must be able to demonstrate actual prejudice occurring between the date of the sealing and the date of the unsealing.").

With that question in mind, I turn first to the testimony of Gerald Lee regarding Interchange Design, Sukhamay Bose, and the now-disputed $30,000 payoff. At trial, Lee testified that Davis was the instigator of the Interchange Design scheme, the first to suggest the fraudulent means—i.e., the creation of a dummy corporation—whereby the co-conspirators could get their hands on "a windfall ... coming to the company." (Tr. at 384–85). Once the scheme was implemented and funds were coming in, Lee testified that he "sat down and figured out how to divide [the profits] amongst the officers involved." (Tr. at 385). George Davis's allotted portion was $30,000, and Davis requested that the amount be delivered to him in the form of a check made out to a shipping company. (Tr. at 385–86). On cross-examination, Lee stated that he knew Sukhamay Bose only as "a gentleman who we signed a fraudulent consulting agreement with" (Tr. at 436); he knew of no connection between Bose and Mamoni Shipping Company. (*Id.*). Lee testified further that he was acquainted with Jerry Shanks, had on occasion seen him and greeted him in Pete's Tavern, but had never transacted business with him in that restaurant. (Tr. at 439–40). The name Martin Hambrose was not familiar to Lee, and he had no memory of a luncheon engagement with Hambrose in 1976. (Tr. at 440–41).

Defendant argues that the testimony of both Shanks and Hambrose would have called into question the veracity of Lee's version of events. More specifically, ac-

cording to defendant, Shanks would have testified that, in mid-1977, he was at the bar in Pete's Tavern with George Davis when Lee presented Davis with a $30,000 Interchange Design check made out to Mamoni Shipping Company, reminding Davis that, "as they had previously discussed, some money was due to Bose." (Hollman Aff. ¶ 29). Davis purportedly told Lee that "he remembered that being a problem," pocketed the check, and said he would take care of it. (Id.). Defendant argues that Shanks's testimony would indicate that Davis was merely a courier of sorts—i.e., that the $30,000 check was intended for Bose, not Davis, apparently in connection with some unrelated transaction. Such testimony would be contrary to Lee's assertions regarding Davis's participation in, and profit from, the Interchange Design scheme.

Hambrose's testimony, according to Davis, would further support defendant's version of events. Hambrose purportedly would testify that, at a luncheon meeting with Davis and Lee in 1977, Lee was called away from the table to take a telephone call and returned in a highly agitated state. The explanation for his agitation, according to Hambrose's anticipated testimony, would be that Bose was "trying to screw him" by demanding money in addition to the $30,000 check that Lee had already given Davis to turn over to Bose. Hambrose's testimony would further indicate that Davis told Lee he remembered the $30,000 check and that "Bose now had the money." (Hollman Aff. ¶ 32). This testimony, defendant argues, would demonstrate that Davis was not a party to any payoff between Lee and Bose.

The Government continues to argue, with some force, that Davis's claim of prejudice is premised on a purely speculative, and highly unlikely, assertion of what Shanks's and Hambrose's testimony would actually be. Counsel for defendant, in an initial telephone call with Shanks prior to his death, learned only that Shanks "was familiar with the South Carolina matter, and knew of Shuk Bose." (Hollman Aff. ¶ 30). Although Shanks indicated that he

was friendly with defendant Davis and would be willing to talk further with Mr. Hollman, there was no discussion of the Pete's Tavern encounter. Hambrose, who died in 1982, was never initially interviewed. This is not, in other words, a situation where defense counsel elicited from now-unavailable witnesses some concrete indication of what their testimony would be. Rather, defendant's claim of prejudice turns on the presumption that Shanks and Hambrose would share his apparently vivid memory of two brief conversations overheard some seven years ago. The Government questions this assumption and disputes as inherently incredible the notion that "Davis and Lee would have had such incriminating conversations in the presence of uninvolved persons." (Gov't Letter of March 27, 1984, p. 2).

I, too, am troubled by the possibility that dismissal of a properly sealed indictment may be achieved on the strength of a defendant's unsupported and uncorroborated assertions of what a deceased witness's testimony would, in fact, have been. The temptation to portray that testimony as highly exculpatory, and thereby demonstrate the requisite "actual prejudice," is obviously strong. A useful analogue in circumscribing and giving content to the "actual prejudice" standard referred to in *Muse, supra,* are those cases involving pre-indictment delay, where dismissal is also predicated on a showing of actual prejudice. In such circumstances, courts have repeatedly held that the burden of demonstrating prejudice occasioned by the lapse of time is on the defendant, and "the proof of prejudice must be definite and not speculative." *United States v. Birney,* 686 F.2d 102, 105–06 (2d Cir.1982). *See also United States v. Edwards,* 577 F.2d 883, 891 (5th Cir.1978) (claim of prejudice arising out of the death of an allegedly material defense witness held insufficient in light of the sparse nature of the record concerning the testimony the defense could have elicited from the deceased); *United States v. Ciraulo,* 486 F.Supp. 1125 (S.D.N.Y.1980) (conclusory assertion that passage of time

had weakened the memory of potential defense witnesses and eliminated evidence that would otherwise have been available to defendant was, without more specific evidential support, insufficient to demonstrate actual prejudice); *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.1979) (defendant's claim that potential defense witnesses were lost by Government intimidation during the lengthy pre-indictment period, and that other defense witnesses' memories had dimmed, was insufficient to demonstrate substantial actual prejudice); *United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (finding of prejudice to defendant occasioned by delay requires "some plausible explanation of the assistance he would have received from the testimony of [now-unavailable] witnesses").

Where the prejudice claimed arises out of the death of a defense witness, one court recently stressed the defendant's obligation "to demonstrate the general content of the lost evidence and show that it had a material connection with his defense to the crimes charged." *United States v. Sample,* 565 F.Supp. 1166, 1175 (E.D.Va.1983). The court went on to observe that when the only source of information as to the substance of the lost testimony is the defendant himself, "the defendant's incentive to emphasize, perhaps over-emphasize, the importance of the dead witness cannot be overlooked." *Id.* at 1175. In *Sample,* the court found "actual prejudice" occasioned by the death of a potential defense witness, but only after determining that defendant's characterization of that testimony was amply corroborated by a lengthy deposition of the deceased witness taken in the course of a prior civil action. As stated by the court:

> "Mr. Seidell's deposition thus firmly establishes the general and in some instances the specific content of what his testimony would be were he alive to testify at a criminal trial in Sample's behalf. On the basis of the deposition, there is no doubt that Mr. Seidell's testimony would be heavily favorable to the defendants. The deposition testimony specifically refutes a number of the allegations of false statements contained in the indictment and refutes the allegations in the indictment that these statements were knowingly false and fraudulent.... If credited by a jury, Mr. Seidell's testimony would at the least create a reasonable doubt as to defendants' guilt. Indeed, his testimony exonerated defendants."

No such corroboration of the alleged Shanks and Hambrose testimony has been offered here, and I would be loathe to dismiss the indictment on the basis of defendant's potentially self-interested depiction of what that testimony would reveal. But even assuming that their testimony would have followed the lines defendant suggests, I cannot conclude, in light of the totality of the evidence presented against Davis, that defendant has been prejudiced.

At best, the Shanks and Hambrose testimony would suggest to the jury that the $30,000 Interchange Design check made out to Mamoni Shipping Company was not, as Lee testified, Davis's share of the illegal profits but was instead intended as a payment for Bose in connection with some other transaction. To the extent that this distribution of the illegal profits differs from that suggested by Lee, the testimony is arguably exculpatory. But Shanks would also allegedly testify that he told Davis, based on his observations at Frigitemp, that Lee was "stealing the place blind" through use of the Interchange Design Company, to which defendant responded, apparently in tacit agreement, that he planned to resign from Frigitemp. (Hollman Aff. ¶ 29). This conversation, coupled with Hambrose's anticipated testimony— that defendant subsequently assured Lee he had taken care of paying off Bose with the $30,000 check (*Id.* ¶ 33)—would, in my view, be inculpatory, as evidence of Davis's knowing participation in the conspiracy and his role as distributor of the fraudulent proceeds. It is not, of course, necessary to personally profit from a fraudulent scheme to be found guilty of conspiracy.

Even aside from the questionable value of the Shanks and Hambrose testimony to defendant's case, proof of Davis's participation in the conspiracy charged was not dependent on Lee's testimony as to the particular distribution of profits or the handling of the $30,000 Interchange Design check. First, as noted above, Lee testified that the initial impetus for the Interchange Design scheme came from Davis, who worked with Arnold Suekoff to implement the scheme. (Tr. at 384–85). Suekoff testified in detail as to the steps involved in locating and setting up the dummy corporation. George Davis was the reference Suekoff listed in establishing Interchange Design's bank account at Banco Populare (Tr. at 135), and Davis personally directed Suekoff to type, from Davis's handwritten copy, the false contract between Interchange Design and Frigitemp (Tr. at 136). Periodically, Davis told Suekoff to prepare false Interchange Design invoices in specific amounts for services purportedly rendered to the Environmental and Energy Division of Frigitemp (Tr. at 136–37), and Davis further directed Suekoff to type various fraudulent letters, which Davis himself had drafted, concerning the Interchange Design/Frigitemp agreement. (Tr. at 139–155).

Other witnesses also testified as to Davis's central role in the Interchange Design conspiracy. David Logan stated that he signed a number of Interchange Design invoices, thereby authorizing payment from Frigitemp, at the direction of defendant Davis. His testimony was as follows:

Q. Now, Mr. Logan, you have testified that your signature appears on a number of these invoices and your name appears on several others.

Can you tell us how you came to put your signature on the ones that you admit you did sign?

A. I was asked to by Mr. Davis.

Q. Could you tell us how that happened?

A. I think he just showed them to me and asked me to sign them, and I believe I asked why, and he said, Don't worry about it, just sign them. So, I did. (Tr. at 338–39).

As Frigitemp's general counsel, Lee Mermelstein was asked to review the proposed —and, unbeknownst to him, fraudulent— contract between Interchange Design and Frigitemp. It was George Davis who met with Mermelstein and worked with him in drafting the dummy contract that Mermelstein eventually felt was satisfactory. (Tr. at 499–502). Mermelstein further testified that, at a later time, he became concerned about what appeared to be an illegitimate modification of the contract to pay an additional $110,000 to Interchange Design. Mermelstein voiced his concern to Lee, who apparently passed along that concern to the individual responsible for the modification, George Davis. The excess, and now suspect, fraudulent profit was thereafter cancelled. (Tr. at 506–513).

After considering the totality of evidence presented at trial regarding Davis's participation in the Interchange Design conspiracy, I cannot conclude that the alleged Shanks and Hambrose testimony could, even if credited by a jury, create a reasonable doubt as to defendant's guilt. That is the criterion imposed by *Sample, supra,* a pre-indictment delay case in which defendant complained of a deceased witness. *Cf. United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) (where prosecution wrongfully suppresses exculpatory evidence, constitutional error arises only "if the omitted evidence creates a reasonable doubt that did not otherwise exist," a test requiring "that the omission must be evaluated in the context of the entire record"). Indeed, his involvement in the scheme would appear to be so substantial as to suggest to a jury another, perhaps more credible, explanation for the Shanks testimony—that Lee and Davis were speaking guardedly and with the intention to conceal from Shanks, a stranger to the fraud, the true nature of the payoff. In sum, I do not find that defendant has demonstrated actual substantial prejudice sufficient to warrant dismissal of the in-

dictment. *See United States v. Birney,* 686 F.2d 102, 105 (2d Cir.1982) (loss of bank records allegedly vital to defense during period of pre-indictment delay was not sufficient to demonstrate actual prejudice in light of other evidence of guilt presented by the Government).

For the reasons stated, defendant's motion to dismiss the indictment and, in the alternative, for an evidentiary hearing is denied.

It is SO ORDERED.

## ON MOTION TO REVOKE BAIL

■ On June 17, 1984, this Court sentenced defendant George G. Davis to a term of three years' imprisonment and a fine of $10,000, following his conviction by a jury on charges of one count of conspiracy in violation of 18 U.S.C. § 371. While defendant's conviction was pending appeal, the Government moved to revoke his bail and remand him to commence service of the sentence. The Government based that motion upon the Bail Reform Act of 1984, P.L. No. 98–473, signed by the President into law on October 12, 1984. Section 3143(b) of that statute provides:

"(b) RELEASE OR DETENTION PENDING APPEAL BY THE DEFENDANT.—The judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

"(1) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to section 3142(b) or (c); *and*

"(2) that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial.

"If the judicial officer makes such findings, he shall order the release of the person in accordance with the provisions of section 3142(b) or (c)." (emphasis added).

The use of the conjunctive indicates that the judge is under an obligation to detain the defendant—the statute uses the phrase "shall order" that the convicted defendant be detained—unless the separate findings summarized by subsection (b)(1) and (2) are both made.

In the case at bar, during the pendency of the Government's application, the Court of Appeals for the Second Circuit affirmed Davis's conviction by order filed on November 5, 1984. The conviction was affirmed summarily on the basis of this Court's prior opinions in the case; the Court of Appeals stated: "We have considered all of appellant's arguments and they are without merit."

While defendant still has the right to petition the United States Supreme Court for a writ of certiorari, the statute by its own terms embraces that additional appellate step; and I am hardly in a position, in these circumstances, to find that Davis's further appeal would raise "a substantial question of law or fact likely to result in reversal or an order for a new trial," as required by subsection (b)(2).

While the statute significantly reduces the availability of bail following conviction in criminal cases, that was the clear intent of Congress. The Senate Judiciary Committee Report accompanying the bill, S.Rep. 98–225, 98th Cong., 1st Sess. (September 12, 1983) at 26 observed: "... the current statute incorporates a presumption in favor of bail even after conviction. It is the presumption that the Committee wishes to eliminate in Section 3143." The requisite judicial findings that the appeal not be taken for the purpose of delay and that it raises a substantial question of law or fact, likely to result in reversal or order for a new trial, are characterized collectively as "a further restriction on postconviction release." *Id.* at 27.

Davis's primary argument in resisting revocation of bail and remand is that the 1984 statute should not be applied "retroactively," so as to govern the bail and re

mand status of a defendant convicted prior to the date when the statute became effective. His argument must be that the statute has impermissible *ex post facto* characteristics; but it does not. *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), clearly holds within a sentencing context that "the prohibition of *ex post facto* laws does not extend to every change of law that 'may work to the disadvantage of a defendant'. It is intended to secure 'substantial personal rights' from retroactive deprivation and does not 'limit the legislative control of remedies and modes of procedure which do not affect matters of substance.'" Rehnquist, Circuit Justice, in *Portley v. Grossman*, 444 U.S. 1311, 1312, 100 S.Ct. 714, 715, 62 L.Ed.2d 723 (1980). These principles govern the case at bar. Davis's substantive personal rights, in contesting his guilt or pressing an appeal, are not affected by the Bail Reform Act of 1984. His entitlement to bail, and the criteria by which that entitlement will be measured, constitute "modes of procedure" falling outside the *ex post facto* rule, notwithstanding the fact that increased restrictions upon bail pending appeal may undoubtedly "work to the disadvantage" of defendants.

At oral argument on the application, the prosecutor pressed for instant remand, or at the most a bench warrant with execution stayed for 24 hours. The Court raised the question of the voluntary surrender program. That program received the endorsement of Deputy Attorney General Charles B. Renfrew (a former federal district judge) in his letter of April 28, 1980 to the Director of the Administrative Office of the United States Courts. The Deputy Attorney General wrote:

"Over 20 percent of all commitments from the Federal courts now voluntarily place themselves in the custody of the U.S. Marshal or report to the institution where they are designated to serve their sentences. The cost savings to the government are significant; a study by the Bureau of Prisons of all voluntary surrenders for the three months of July, August, and September, 1979, found that the cost savings to the Federal government amounted to over $500,000 during that short period. In addition to savings in the costs of transportation and temporary imprisonment, voluntary surrender in most instances is also preferable to the inmate and to the inmate's family."

\* \* \* \* \* \*

"I would like to urge all Federal judges to give serious consideration to the possibility of ordering voluntary surrender when persons are committed to serve time in Federal custody. I would expect that voluntary surrender might be found appropriate for a majority of offenders at low custody levels, and may also be possible for many offenders at higher custody levels. From the standpoints both of costs to the Federal government and the sensibilities of inmates and their families, voluntary surrender ought to be preferred whenever it is consistent with the public safety and the orderly administration of justice."

The prosecutor's response at oral argument, if I understand it correctly, would as a practical matter do away with this salutary program, since the Government appears to construe the statutory phrase "be detained" to mean "be detained immediately." But I may enforce the Bail Reform Act of 1984 without scuttling a program which, for obvious reasons, the Justice Department holds in high regard; and I decline to do so in the case at bar.

Defendant Davis will accordingly be directed to surrender voluntarily, and at his own expense, to the facility designated by the Bureau of Prisons. I am informed in the Government's letter to me of November 16, 1984 that the Bureau of Prisons has in fact designated the defendant to commence service of his sentence at the Federal Correctional Institution in Tallahassee, Florida. While typically the advice as to the designated institution comes from the Bureau of Prisons directly, I have no reason to doubt the representation of counsel. Accordingly defendant Davis is directed to report directly to that institution, at his

own expense, not later than 12:00 noon on November 26, 1984. I hereby direct that a bench warrant for the arrest of defendant Davis be issued, but stay its execution until the same date and hour.

I have considered defendant's other arguments on the present application, and find them to be without merit.

The Government's motion for revocation of bail and remand is granted, consistent with this opinion.

It is SO ORDERED.